66 F.3d 1272
 41 ERC 1254, 64 USLW 2186, 25 Envtl.
L. Rep. 21,522
 USA RECYCLING, INC.; Friendly Carting, Inc.; Joseph
Carione; Angelo Carione; Jean I. Carione; Louis
Carione; and Carl R. Fucci, Plaintiffs-Appellees,
v.
TOWN OF BABYLON; Town of Babylon, New York, Commercial
Garbage District No. 2; Town Board of the Town of Babylon;
Richard H. Schaffer, Supervisor; Francine V. Brown,
Councilwoman; Patrick Haugen, Councilman; Robert Kaufold,
Councilman; Anthony Tafuri, Councilman; and Babylon Source
Separation Commercial, Inc., Defendants-Appellants.
A.A. & M. CARTING SERVICE, INC.; Farmingdale Carting
Service, Inc.; Natale Pepe Waste Corp.; PGS Carting Co.,
Inc.; Joseph S. Celano; Marianne Celano; JC Industries,
Inc.; C.B.S. Rubbish Co., Inc.; Farmingdale Industrial
Park Association; Minersfuel Company, Inc.; Resource
Conservation Corp., Plaintiffs-Appellees,
v.
TOWN OF BABYLON, NEW YORK, Commercial Garbage District No.
2, also known as Commercial Waste Collecting and Recycling
District; Town Board of the Town of Babylon; Richard H.
Schaffer; Babylon Source Separation Commercial, Inc.,
Defendants-Appellants.
 Nos. 1818, 1814, Dockets 95-7129, 7131.
 United States Court of Appeals,
Second Circuit.
 Argued April 12, 1995.
Decided Sept. 19, 1995.
 
 Frank L. Amoroso, Nixon, Hargrave, Devans & Doyle, Garden City, NY, for municipal defendants-appellants.
 Anthony E. Core, Mineola, NY, for defendant-appellant BSSCI.
 Betty Jo Christian, Steptoe & Johnson, Washington, DC, for plaintiffs-appellees A.A. & M. Carting Service et al.
 Frederick Eisenbud, Cahn, Wishod & Lamb, Melville, NY, for plaintiffs-appellees USA Recycling, Inc., et al.
 (Gordon J. Johnson, Deputy Bureau Chief, Environmental Protection Bureau, John J. Sipos, Assistant Attorney General, Dennis C. Vacco, Attorney General of the State of New York, for Amicus Curiae State of New York).
 Before: NEWMAN, Chief Judge, VAN GRAAFEILAND and CABRANES, Circuit Judges.
 JOSE A. CABRANES, Circuit Judge:
 
 
 1
 For ninety years, it has been settled law that garbage collection and disposal is a core function of local government in the United States. At their option, cities may provide garbage pick-up to their citizens directly (that is, through town employees or an independent contractor), or they may rely on a closely regulated private market to provide those services. In 1905, the Supreme Court turned away two challenges, brought on takings and due process grounds, to city ordinances in San Francisco and Detroit that gave a single scavenger firm the exclusive right to collect and dispose of city garbage. California Reduction Co. v. Sanitary Reduction Works, 199 U.S. 306, 26 S.Ct. 100, 50 L.Ed. 204 (1905); Gardner v. Michigan, 199 U.S. 325, 26 S.Ct. 106, 50 L.Ed. 212 (1905). Although in neither of these cases did the Court address whether the municipal waste systems comported with the Commerce Clause, we squarely face that question today.
 
 
 2
 The Town of Babylon, New York, has elected to take over the local commercial garbage market. Rather than assemble a municipal waste disposal bureaucracy and purchase directly the necessary equipment, the Town has hired one private company to pick up all commercial garbage, and another to operate an incinerator where that garbage is burned. Businesses and commercial property owners finance this system by paying the Town flat property taxes and user fees tied to the amount of garbage they generate. No private companies, local or out-of-state, may collect commercial garbage in Babylon.
 
 
 3
 The plaintiffs in these consolidated cases argue that the Supreme Court's decision in C & A Carbone, Inc. v. Town of Clarkstown, --- U.S. ----, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), has stripped local governments of their long-settled authority to collect and dispose of town garbage. In Carbone, the Supreme Court struck down a municipal ordinance that required private garbage haulers to process all town garbage at a single, privately owned local transfer station. Likewise, the present plaintiffs argue, Babylon has in effect created monopolies in the waste collection and disposal markets by taking over both markets and then hiring independent contractors to provide services on the Town's behalf. This system, they contend, discriminates against interstate commerce and therefore violates the Commerce Clause.
 
 
 4
 We disagree. Babylon's waste management plan, which so closely resembles those approved by the Supreme Court in California Reduction and Gardner, neither discriminates against, nor imposes any incidental burdens on, interstate commerce. In reaching that conclusion, we reject the plaintiffs' contention that the Carbone decision fashioned from the "dormant" Commerce Clause a new, and unprecedentedly sweeping, limitation on local government authority to provide basic sanitation services to local residents and businesses, on an exclusive basis and financed by tax dollars. Such a limitation, to borrow the words of the Supreme Court, "would interfere significantly with a State's ability to structure relations exclusively with its own citizens. It would also threaten the future fashioning of effective and creative programs for solving local problems and distributing governmental largesse. A healthy regard for federalism and good government renders us reluctant to risk these results." Reeves, Inc. v. Stake, 447 U.S. 429, 441, 100 S.Ct. 2271, 2279-80, 65 L.Ed.2d 244 (1980) (citation omitted).
 
 
 5
 The United States District Court for the Eastern District of New York (Thomas C. Platt, Chief Judge ) entered a preliminary injunction against the Town of Babylon's implementation of its waste management plan. The court held that plaintiffs in these consolidated cases, USA Recycling and A.A. & M. Carting, had demonstrated that their challenge to the Town's system was virtually certain to succeed in light of the Supreme Court's recent decision in Carbone, --- U.S. at ---- - ----, 114 S.Ct. at 1682-84. We find that plaintiffs have failed to demonstrate a likelihood of success on the merits, because Babylon's system does not violate the dormant Commerce Clause. The district court also erred by granting injunctive relief despite its explicit finding that plaintiffs will not suffer irreparable harm from implementation of Babylon's new waste management system. Because plaintiffs have not made the requisite showings for preliminary injunctive relief, we reverse.
 
 I. FACTS
 
 6
 At the heart of the dispute is the relationship between the Town of Babylon, an incinerator built in Babylon at the behest of the Town ("Incinerator"), and a private garbage hauler hired by the Town (Babylon Source Separation Commercial, Inc., or "BSSCI"). First, we describe the circumstances surrounding the construction and operation of the Incinerator. Second, we describe the town's creation of a commercial garbage district in the wake of the Supreme Court's decision in Carbone. Three aspects of Babylon's waste management plan merit special attention. First, the Town has licensed and hired BSSCI to collect all garbage within the district and has refused to renew the licenses of any other private haulers to collect garbage pursuant to individual contracts with town businesses. Second, the Town permits BSSCI to dispose of town waste at no charge at the Incinerator. Third, the Town finances its commercial garbage collection and disposal system by charging a flat $1500 benefit assessment to commercial property owners, plus a schedule of user fees to individual businesses for garbage they generate beyond a fixed base amount. The facts set forth below are not in dispute.
 
 A. The Babylon Incinerator
 
 7
 In the Long Island Landfill Law of 1983,[1] the New York Legislature set deadlines for Babylon and neighboring towns to shut down their municipal dumps, which were contaminating the aquifer that serves most of Long Island. Because closing its landfill would leave Babylon with a shortage of garbage disposal options, the town began to consider building a garbage incinerator. This choice was consistent with the State of New York's articulated policy preference for incinerators (or "resource recovery facilities," as they are also known) over landfills, because "trash-to-ash" facilities reduce the volume of solid waste, put garbage to productive use by generating electricity, and were deemed to be less harmful to the environment. See N.Y.ENVTL.CONSERV.LAW Sec. 27-0106 (McKinney Supp.1995).[2] To promote its hierarchy of recycling and disposal preferences, New York created a statutory framework that enables towns to contract with private companies to build and operate incinerators and other solid waste management facilities. N.Y.GEN.MUN.LAW Sec. 120-w (McKinney 1986 & Supp.1994). The State Legislature also passed a law specifically authorizing Babylon to enter into contracts to build a garbage incinerator. 1985 N.Y.Laws 478 Sec. 4(1).
 
 
 8
 With state approval (if not encouragement) in hand, and in accordance with the bidding procedure detailed in New York General Municipal Law Sec. 120-w(4)(e) (McKinney 1986),[3] Babylon solicited proposals from more than sixty-nine companies in eighteen states and Canada to construct and operate the Incinerator. Out of the five companies that submitted bids, Ogden Martin Systems, Inc. ("Ogden") was awarded the contract. Ogden is a New Jersey corporation with a Delaware parent.
 
 
 9
 To finance construction of the Incinerator, the Town of Babylon Industrial Development Agency (the "Agency"), a "public benefit corporation" created under New York law and controlled by the Town, issued $88.9 million in tax-exempt bonds.[4] The land on which the Incinerator was built is owned by the Town, leased to the Agency, and subleased to Ogden. The Incinerator itself is owned by the Agency and leased to Ogden, which operates the facility.
 
 
 10
 Under a 1985 Service Agreement between Babylon and Ogden (the "Agreement"), the Town has an unconditional obligation to pay Ogden a Service Fee for operating the Incinerator, regardless of whether any garbage is processed there. Through the Service Fee, Babylon pays for debt service on the bonds, operation and maintenance expenses, and various pass-through costs including trustee fees, payments in lieu of taxes, and the cost of transporting and disposing of ash. Under the Agreement, the Town holds exclusive rights to accept garbage for disposal at the Incinerator, and to set and collect fees for such disposal. Although Ogden controls the day-to-day operations of the Incinerator, the company is required to process whatever garbage the Town accepts for disposal. The Agreement requires Babylon to deliver a minimum of 225,000 tons of garbage each year to the Incinerator.
 
 
 11
 B. Babylon's Pre-Carbone Garbage Collection and Disposal System
 
 
 12
 In 1987, to ensure the financial viability of its Incinerator, the Town passed a flow control ordinance that required all solid waste collected within Babylon to be disposed of at a location designated by the Town. BABYLON CODE Sec. 133-40(A) (1991).[5] Babylon designated its Incinerator as the only permissible disposal site, and required garbage haulers to pay "tipping fees" to the Town for each ton of garbage delivered there. The revenues from these fees offset some of Babylon's costs under its Agreement with Ogden.
 
 
 13
 In 1994, however, the Supreme Court struck down a similar flow control ordinance enacted by another New York municipality that had required the processing of all solid waste in town at a local, privately owned transfer station. C & A Carbone, Inc. v. Town of Clarkstown, --- U.S. ----, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). In light of that decision, Babylon determined that it should no longer enforce its own flow control ordinance, and it looked for a new way to finance its Incinerator.
 
 
 14
 C. The Commercial Garbage Improvement District
 
 
 15
 In response to the Carbone decision, Babylon decided to create Commercial Garbage Collection District No. 2 (the "District"), covering most commercial real estate in town.[6] Uniform municipal collection and disposal of waste generated in the District was designed to replace the multitude of contracts between individual commercial garbage generators and the seventeen haulers licensed to collect commercial waste in Babylon.[7] Based on various cost surveys and a competitive bidding procedure pursuant to N.Y. General Municipal Law Sec. 120-w(4)(e) (McKinney 1986), the Town concluded that it could provide better garbage service to commercial property at an overall savings of $7 million to $8 million per year to town consumers.
 
 
 16
 Based on the bids submitted, the Town entered into a five-year Service Agreement with Babylon Source Separation Commercial, Inc. ("BSSCI") to provide garbage hauling services to all improved commercial property within the District. Under the Service Agreement, the Town agreed to grant BSSCI an exclusive license to collect commercial garbage within the District.[8] Each month, the Town must pay BSSCI a base fee of $22.75 per week for basic service to each parcel, plus additional fees for collection of garbage above the base amount.
 
 
 17
 The Service Agreement permits BSSCI to dispose of up to 96,000 tons of garbage per year at the Incinerator and unlimited amounts of recyclable material at the town recycling facility, all at no charge. If BSSCI dumps more than 96,000 tons at the Incinerator, it is obligated to "pay the prevailing tipping fee to the Town at the time of such delivery." BSSCI has the option to deliver commercial refuse elsewhere, but it must bear those disposal costs itself. Although Babylon retains the right to direct BSSCI to deliver the contract waste to a particular disposal site, in which case the Town is responsible for paying any disposal fees, the Town has not indicated that it wishes to exercise this contractual right.
 
 
 18
 To finance the provision of collection and disposal services in the District, the Town imposed a $1500 annual benefit assessment against each improved parcel of commercial property within the District. All such parcels are entitled to "basic service" from BSSCI, defined as weekly collection of one cubic yard of commercial refuse and one-half cubic yard of recyclables. The property owner may allocate this basic service to one commercial establishment per parcel. Other businesses on a parcel, and those businesses requiring more than basic service, must pay a user fee for each additional cubic yard of garbage. If a business cannot agree with BSSCI as to how much extra service is needed, a contract monitor appointed by the Town will determine the appropriate service level that the business must receive.
 
 D. Proceedings in the District Court
 
 19
 In mid-December 1994, plaintiffs filed the present actions in the United States District Court for the Eastern District of New York, seeking to prevent Babylon from implementing its contract with BSSCI to provide collection and disposal services in the District, and from failing to renew the plaintiffs' existing licenses to collect garbage on a town-wide basis. The plaintiffs in USA Recycling, Inc. v. Town of Babylon (No. 95-7129) include a commercial solid waste management recycling facility, a garbage collection company that is currently licensed to collect garbage in Babylon, several individuals who own commercial property within the District, and an individual who owns a business located in the District (the "USA Recycling plaintiffs"). The plaintiffs in A.A. & M. Carting Service, Inc. v. Town of Babylon, New York, Commercial Garbage District No. 2 (No. 95-7131) are an out-of-state waste disposal facility, a motor carrier engaged in interstate transportation of solid waste, five local waste collection companies currently licensed to collect garbage in Babylon, and an association of small businesses that generate waste within the District (the "A.A. & M. Carting plaintiffs").
 
 
 20
 Plaintiffs claim primarily that the Town's plan to collect and dispose of commercial garbage violates the so-called "dormant" Commerce Clause of the United States Constitution, which limits the states' ability to regulate interstate commerce absent congressional authorization. Specifically, they argue that the exclusion of all private garbage haulers from the commercial garbage collection market, the Town's decision to let its hired garbage hauler dispose of garbage at no charge at the Babylon Incinerator, and the user fees and benefit assessments charged to property owners and businesses within the District add up to a system that impermissibly discriminates against interstate commerce in the waste collection and disposal markets.
 
 
 21
 On December 30, 1994, the district court held a hearing on a motion for a preliminary injunction in USA Recycling, and entered an order applicable to both of the instant cases on January 5, 1995. That order denied all pending motions for injunctive relief without prejudice to renewal, but directed the Town to maintain the status quo and to recognize the existing licenses of collection companies pending amendment of the Town Code. Babylon and BSSCI initially filed an appeal and sought an emergency stay of that order from this Court, but then withdrew their appeal.
 
 
 22
 On January 10, 1995, Babylon amended its Town Code to implement the new plan.[9] One new provision of the Town Code effectuates the exclusive collection provision of the BSSCI Service Agreement: only BSSCI, as the sole collector that has entered into a contract with the Town, is eligible for a license to collect nonrecyclable garbage generated within Babylon's commercial garbage district. Local Law No. 2 of 1995 (to be codified at BABYLON CODE Sec. 133-14(B)). Other provisions make it illegal for an individual commercial waste generator to dispose of its own waste, either by contracting with a garbage hauler that lacks a Town license, or by transporting its own waste without a "special exemption" from the Town Board upon a showing of "exceptional circumstances." Local Law No. 2 of 1995 (to be codified at BABYLON CODE Secs. 133-11(B)(3), 133-37). Plaintiffs in both actions amended their complaints and renewed their motions for preliminary injunctive relief.
 
 
 23
 On February 2, 1995, the district court granted those motions in a consolidated ruling. Assertedly guided by the Supreme Court's decision in Carbone, the court determined that the plaintiffs' challenge to the Babylon waste management system was likely to succeed on the merits. The court stated that the Service Agreement "gave BSSCI not only a powerful, but virtually an irresistible incentive to dispose of the waste at the town facility," and thus hoarded the local demand for waste collection and disposal services for the benefit of BSSCI and the Incinerator. As a result, the court concluded that the amended Babylon ordinance had the same discriminatory effect on interstate commerce as the ordinance struck down in Carbone. Despite its explicit finding that plaintiffs would not suffer irreparable harm from their exclusion from Babylon's commercial garbage market, the court entered a preliminary injunction prohibiting the Town and BSSCI from implementing the District garbage collection system.
 
 
 24
 Babylon and BSSCI appeal from that order. We expedited that appeal, and now reverse.
 
 II. DISCUSSION
 A. Standard of Review
 
 25
 It is well established in our Circuit that a court may grant a plaintiff preliminary injunctive relief only upon a showing ofirreparable harm, and either (1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor.
 
 
 26
 Polymer Technology Corp. v. Mimran, 37 F.3d 74, 77-78 (2d Cir.1994) (citation and internal quotation marks omitted). We have explained that
 
 
 27
 if the moving party has established the requirements for such an injunction, the injunction may be reversed only if the district court has abused its discretion. A district court may abuse its discretion by applying an incorrect legal standard or by basing the preliminary injunction on a clearly erroneous finding of fact.
 
 
 28
 Waldman Publishing Corp. v. Landoll, Inc., 43 F.3d 775, 780 (2d Cir.1994) (citation omitted).
 
 
 29
 We first review the district court's determination that the plaintiffs had demonstrated a likelihood of success on the merits of their Commerce Clause claim, and then turn to whether plaintiffs have shown that they would suffer irreparable harm.
 
 B. Likelihood of Success on the Merits
 1. Commerce Clause Jurisprudence
 
 30
 The Commerce Clause provides that Congress "shall have Power ... To regulate Commerce with foreign Nations, and among the several States." U.S. CONST. art. I, Sec. 8, cl. 3. "Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 87, 104 S.Ct. 2237, 2240, 81 L.Ed.2d 71 (1984). This negative restriction on state power has often been labelled the "dormant" Commerce Clause. Oklahoma Tax Comm'n v. Jefferson Lines, Inc., --- U.S. ----, ----, 115 S.Ct. 1331, 1335, 131 L.Ed.2d 261 (1995).
 
 
 31
 To determine whether a state or municipal activity violates the dormant Commerce Clause, the Supreme Court has instructed us to undertake two separate inquiries. First, we must determine whether the state is "regulating" the market at all, as opposed to merely "participating" in it. See Reeves, Inc. v. Stake, 447 U.S. 429, 436-39, 100 S.Ct. 2271, 2277-79, 65 L.Ed.2d 244 (1980). If the state is buying or selling goods as any private economic actor might, then it is engaging in "market participation" that by definition falls outside the scope of activity governed by the dormant Commerce Clause. Id. at 438-39, 100 S.Ct. at 2278. On the other hand, if the state activity constitutes "regulation" of interstate commerce, then the court must proceed to a second inquiry: whether the activity
 
 
 32
 regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce. As we use the term here, "discrimination" simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. If a restriction on commerce is discriminatory, it is virtually per se invalid. By contrast, nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).
 
 
 33
 Oregon Waste Sys., Inc. v. Department of Envtl. Quality, --- U.S. ----, ----, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994) (citations and internal quotation marks omitted).[10]
 
 
 34
 The party challenging the validity of a state statute or municipal ordinance bears the burden of showing that it discriminates against, or places some burden on, interstate commerce. Hughes v. Oklahoma, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979). If discrimination is established, the burden shifts to the state or local government to show that the local benefits of the statute outweigh its discriminatory effects, and that the state or municipality lacked a nondiscriminatory alternative that could have adequately protected the relevant local interests. Id. If the challenging party cannot show that the statute is discriminatory, then it must demonstrate that the statute places a burden on interstate commerce that "is clearly excessive in relation to the putative local benefits." Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 471, 101 S.Ct. 715, 728, 66 L.Ed.2d 659 (1981) (quoting Pike, 397 U.S. at 142, 90 S.Ct. at 847).
 
 
 35
 In accordance with the Supreme Court's instructions, we proceed to decide whether each component of Babylon's waste management system constitutes "regulation" of commerce and, if so, whether such regulation violates the Commerce Clause. We first examine the Town's relationship with businesses and property owners in the District, where it has elected to occupy the entire field of garbage collection. We then discuss in turn the Town's relationships with BSSCI and Ogden.
 
 
 36
 2. The Relationship Between the Town and Businesses and Property Owners in the District
 
 
 37
 The Town of Babylon has taken over the local commercial garbage collection market. No private haulers may enter into garbage collection contracts with individual businesses. Instead, the Town (through its contractor, BSSCI) provides exclusive collection services within the District. Relying primarily on C & A Carbone, Inc. v. Town of Clarkstown, --- U.S. ----, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), the plaintiffs claim that their exclusion from this market facially discriminates against interstate commerce because it favors a single garbage hauler (BSSCI) and a single garbage disposal facility (the Incinerator) over all other in-state and out-of-state competitors. Hence, they argue, the Town's commercial garbage collection system violates the dormant Commerce Clause.
 
 
 38
 Babylon responds in three ways. First, it argues that its takeover of the local garbage collection market is insulated from Commerce Clause scrutiny because it constitutes "market participation," not "market regulation." Second, the Town argues that even if its assumption of garbage collection duties in the District constitutes market regulation, it has not discriminated in favor of any local company. Rather, it has evenhandedly prohibited local businesses from entering into contracts with any garbage haulers--local or out-of-state--and provided uniform garbage collection and disposal as a government service through its agent, BSSCI. Third, the Town argues that its system does not place an undue burden on interstate commerce. We address each of these arguments in turn.
 
 
 39
 a. Market Participation/Market Regulation
 
 
 40
 As an initial matter, we hold that the Town's decision to replace the private market for commercial garbage collection with uniform municipal collection is subject to the limitations of the dormant Commerce Clause because it constitutes regulation of that market, not participation in it. Babylon has exercised its governmental powers by denying licenses to all garbage haulers but the one hired by the Town, and by establishing civil and criminal penalties for haulers who collect garbage without a license. Because no private actor could engage in such activity, the Town is acting as a market regulator rather than a market participant. See SSC Corp. v. Town of Smithtown, 66 F.3d 502, 512 (2d Cir.1995). The Town does "participate" in the garbage collection market in a different respect: it buys garbage hauling services from BSSCI. But states and local governments do not enjoy carte blanche to regulate a market simply because they also participate in that market. Id. at 513; cf. South-Central Timber, 467 U.S. at 97, 104 S.Ct. at 2245 (plurality opinion) (holding that Alaska may not regulate timber processing market simply because it participates in timber sales market). Particular state actions that do not constitute "market participation" are subject to the limitations imposed by the Commerce Clause. A state engaging in mercantile activity does not obtain blanket immunity to regulate the market in which it participates, free from the strictures of the dormant Commerce Clause. Courts must evaluate separately each challenged activity of the state to determine whether it constitutes participation or regulation.
 
 
 41
 b. Discrimination Against Interstate Commerce
 
 
 42
 Although the Town's decision to eliminate the commercial garbage collection market constitutes "market regulation" rather than "market participation," we find that it does not discriminate in any way against interstate commerce. The Town has not favored in-state garbage haulers over out-of-state competitors. Cf. Chemical Waste Management, Inc. v. Hunt, 504 U.S. 334, 343-44, 112 S.Ct. 2009, 2014-15, 119 L.Ed.2d 121 (1992) (striking down state tax imposed only on hazardous waste generated outside state but disposed of within state). Nor has the Town handicapped other in-state and out-of-state businesses from competing against a group of local proprietors. Cf. Dean Milk Co. v. City of Madison, 340 U.S. 349, 356, 71 S.Ct. 295, 298-99, 95 L.Ed. 329 (1951) (striking down ordinance requiring all milk sold in city to be pasteurized within five-mile radius of city limits). The plaintiffs argue, however, that Babylon is favoring a single local garbage hauler to the detriment of both in-state and out-of-state competitors. In essence, they argue that the Town's exclusion of private garbage haulers and the hiring of a single garbage hauler--whether that hauler is BSSCI or some other company--is nothing more than a crude facade for a flow control ordinance like the one struck down by the Supreme Court in Carbone. Babylon, they claim, has conferred on BSSCI the same favored status that Clarkstown bestowed on its local, privately owned transfer station. We disagree.
 
 
 43
 No one enjoys a monopoly position selling garbage collection services in Babylon's commercial garbage market, because the Town has eliminated the market entirely. Not even the Town itself remains as a seller in the market. Although the Town is now the lone provider of garbage collection services in the District, it does so as a local government providing services to those within its jurisdiction, not as a business selling to a captive consumer base. Babylon's waste management plan thus differs dramatically from the flow control ordinances struck down by the Supreme Court in Carbone and by this court in SSC Corp. In both of those cases, the challenged flow control ordinances required local garbage haulers to buy processing or disposal services from a local facility. Carbone, --- U.S. at ----, 114 S.Ct. at 1680; SSC Corp., 66 F.3d at 505. In Babylon, local businesses do not buy services from anyone. Instead, the Town unilaterally provides garbage service to everyone in the District. Although taxpayers in the District ultimately foot the bill for these garbage services--just as they foot the bill for street sweeping, street lighting, sewage treatment, public schools, and police and fire protection, to name just a few other basic services provided by local governments--the payment of taxes in return for municipal services is not comparable to a forced business transaction that the ordinances in Carbone and Smithtown required, and that rendered those ordinances discriminatory against interstate commerce. In short, because Babylon is not selling anything, it cannot be considered to be a favored single local proprietor as in Carbone.
 
 
 44
 New York law makes clear that the Town is fulfilling a governmental duty, not making a sale, when it provides garbage services. New York municipalities have a duty to ensure proper collection and disposal of trash for the well-being and health of the community. Nehrbas v. Incorporated Village of Lloyd Harbor, 2 N.Y.2d 190, 194-95, 159 N.Y.S.2d 145, 140 N.E.2d 241 (1957); 1979 N.Y.Op.Att'y Gen. (Informal) 237 ("Generally, the removal of garbage is an affirmative duty properly delegated to and imposed upon municipalities."). To fulfill this duty,
 
 
 45
 [a] municipality may perform the function of removal directly through its own department; or it may have it performed under a public contract; or it may require a license to be obtained by persons or firms authorized and qualified to perform that function. It is for the municipality, within reasonable bounds, to determine how they shall be collected and removed, or rendered harmless. But it still has the duty to exercise such supervision and control as will prevent danger to public health and injury to the public interest.
 
 
 46
 P. & A. Carting Co. v. City of New York, 7 Misc.2d 815, 817, 158 N.Y.S.2d 296 (Sup.Ct., Special Term, N.Y. County 1956) (citation and quotation marks omitted); 1979 N.Y.Op.Att'y Gen. (Informal) 237 ("[M]unicipalities can contract with corporations to perform [the] municipal service [of removing garbage]."). Although a town does not assume the duty to pick up trash itself simply by creating a garbage district, Industrial Refuse Sys., Inc. v. O'Rourke, 134 Misc.2d 45, 52-53, 509 N.Y.S.2d 988 (Sup.Ct.Westchester Cty.1986), aff'd as modified sub nom. Pelliccio v. Axelrod, 131 A.D.2d 650, 516 N.Y.S.2d 903 (2d Dep't), appeal denied, 70 N.Y.2d 610, 522 N.Y.S.2d 110, 516 N.E.2d 1223 (1987), it may certainly take on that duty expressly. Under New York law, when Babylon prohibited local businesses from arranging privately for garbage removal, it had to ensure that garbage would nevertheless be collected and disposed of properly in some other way.[11]
 
 
 47
 In Babylon, the Town chose to replace private commercial garbage hauling with public garbage collection--provided not by trucks and employees of the Babylon Department of Public Works, but by an independent contractor (BSSCI) hired by the Town. The Town's decision to hire an outside firm to provide services on the Town's behalf is quite unremarkable. State governments have turned to the private sector to "contract out" or "outsource" numerous governmental functions, including services in correctional facilities, the management of concessions in public parks, the operation of mental health facilities, the training of displaced workers, and the operation of toll roads. See generally JOAN W. ALLEN ET AL., THE PRIVATE SECTOR IN STATE SERVICE DELIVERY (1989). The same is true of local governments, including in the field of waste disposal. As environmental regulations proliferate, towns may find that their staffs lack the requisite expertise to provide sanitation services in compliance with state and federal mandates. Such expertise may be more readily available in the private sector, from firms that specialize in waste removal. The U.S. Office of Technology Assessment has observed that as municipal solid waste systems become more complex,
 
 
 48
 municipalities (especially the smaller ones) may be reluctant to assume the primary responsibility for operating a complex business. The large waste management companies that have emerged are sophisticated in the technical aspects of [municipal solid waste] management and financially capable of accepting some of the associated business risks. At the municipal level, the prospect of contracting out increasingly complicated waste management services has become particularly attractive.
 
 
 49
 OFFICE OF TECHNOLOGY ASSESSMENT, U.S. CONGRESS, FACING AMERICA'S TRASH: WHAT'S NEXT FOR MUNICIPAL SOLID WASTE 54 (reprint ed. 1991). Another reason why local governments often contract out is to avoid investing large sums of money in capital equipment--equipment that might be more cheaply obtained by financing schemes that involve, among other things, the hiring of outside firms. See, e.g., ALLEN ET AL., supra, at 4-5. One survey has shown that, at least in some circumstances, it is more expensive for a local government itself to collect town garbage than for the government to hire a private contractor to do so. BARBARA J. STEVENS, HANDBOOK OF MUNICIPAL WASTE MANAGEMENT SYSTEMS 9 (1980). While the law may distinguish between activities performed by the Town itself and those performed by independent contractors for purposes of tort liability or agency law, plaintiffs offer no authority for the proposition that these distinctions have any constitutional significance.
 
 
 50
 The Town has followed the example set by countless other local governments by hiring a private contractor to collect commercial garbage on its behalf. Pursuant to its contract with the Town, BSSCI must collect all garbage put out for pick-up by all "eligible customers"--that is, all commercial establishments on improved property within the District. The Town, in turn, can levy and collect unpaid user fees and benefit assessments as it would collect any other delinquent local tax. N.Y.TOWN LAW Sec. 198(9)(c) (McKinney 1987); 1987 N.Y.Op.Comptroller 86-88, at 3.
 
 
 51
 In sum, we conclude that town businesses are not forced to purchase anything from the Town (or its agent, BSSCI)--and that the Town has indeed excluded all garbage haulers, including BSSCI, from selling garbage collecting services to businesses in Babylon. The Town's waste management system treats all garbage haulers alike and thus does not discriminate against interstate commerce.
 
 
 52
 The plaintiffs argue that even if the local government could provide exclusive garbage services to all businesses in the District, it nevertheless discriminates against interstate commerce by financing those services through taxes imposed only on businesses and commercial property within the District, rather than through taxes payable by both residents and businesses on a town-wide basis. In support of this argument, plaintiffs point to the Supreme Court's statement in Carbone that if "special financing is necessary to ensure the long-term survival" of a solid waste treatment facility, then "the town may subsidize the facility through general taxes or municipal bonds." --- U.S. at ----, 114 S.Ct. at 1684. "General taxes," the plaintiffs contend, are town-wide taxes that " 'are received for the general purposes of the [government], and [that] are, upon proper receipt, lost in the general revenues.' " Oregon Waste Sys., --- U.S. at ----, 114 S.Ct. at 1353 (first alteration in original) (quoting Flast v. Cohen, 392 U.S. 83, 128, 88 S.Ct. 1942, 1967, 20 L.Ed.2d 947 (1968) (Harlan, J., dissenting)). "Special assessments," by contrast, are imposed only "upon property within a limited area for the payment for a local improvement, supposed to enhance the value of all property within that area." Illinois Cent. R.R. v. City of Decatur, 147 U.S. 190, 197, 13 S.Ct. 293, 293-94, 37 L.Ed. 132 (1893). Plaintiffs contend that the two charges imposed by the Town--the $1500 per-parcel benefit assessment payable by commercial property owners and the additional per-cubic-yard user fees payable by town businesses--are targeted against a "narrowly focused group: potential commercial customers of out-of-state disposal companies," and thereby discriminate against interstate commerce.
 
 
 53
 In our view, the Carbone majority used the phrase "general taxes" as a synonym for nondiscriminatory taxes--that is, taxes that apply evenhandedly to in-state and out-of-state businesses. This interpretation finds support in the Carbone majority's citation to New Energy Co. of Indiana v. Limbach, 486 U.S. 269, 278, 108 S.Ct. 1803, 1810, 100 L.Ed.2d 302 (1988) ("Direct subsidization of domestic industry does not ordinarily run afoul of [the Commerce Clause]; discriminatory taxation of out-of-state manufacturers does."). The Town imposes its fees uniformly throughout the District upon all commercial property, and upon all businesses on such property. The Town does not differentiate between local and nonlocal businesses. Accordingly, we cannot say that those taxes discriminate against nonlocal taxpayers in favor of local taxpayers.[12]
 
 
 54
 Plaintiffs argue that by taxing only commercial property and businesses, the Town is focusing its tax burdens on the entities more likely to engage in interstate commerce--more likely, that is, than individual town residents. If we were to accept this argument, however, all taxes imposed solely on "commercial" entities would inherently discriminate against interstate commerce, and thus fall under the "virtually per se rule of invalidity" under the Commerce Clause. Presumably, such a rule would sweep away everything from state corporate income taxes to corporate franchise taxes. The flaw in the plaintiffs' argument is obvious, however: the local businesses subject to these taxes are equally likely to engage in local commerce as to engage in interstate commerce. The Town's imposition of benefit assessments and user fees within the District has the legitimate, nonprotectionist goal of apportioning the costs of providing services to that district in an equitable manner. It is in the nature of a local improvement district that the town provides services only to property or persons within the district, and that those entities bear all of the costs of those town services. See, e.g., N.Y.TOWN LAW Sec. 198(9)(b) (McKinney 1987). Under New York law, town boards may establish "improvement districts" to provide any of several enumerated services, "wholly at the expense of the district": sewers, drainage, water, water quality treatment, parks, public parking, lighting, snow removal, water supply, sidewalks, fallout shelters, refuse and garbage collection, aquatic plant growth control, ambulance service, harbor improvement, public dock, beach erosion control. Id. Sec. 198 (McKinney 1987 & Supp.1994).[13] All of these districts are financed through charges levied against those persons who benefit from the services provided within that district. In general, the town may levy assessments based on either an "ad valorem basis," meaning against property owners in proportion to the value of the property, or a "benefit basis," meaning in proportion to the actual benefit conferred by the district on property. Id. Sec. 202. Making local businesses bear the tax bill for municipal services does not discriminate against interstate commerce.
 
 
 55
 c. The Pike Balancing Test: Undue Burden on Interstate Commerce
 
 
 56
 Having concluded that Babylon's assumption of collection duties in the garbage market does not discriminate against interstate commerce, we now must evaluate its commercial waste disposal system under the balancing test set forth in Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). In that case, the Court stated that where a
 
 
 57
 statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.
 
 
 58
 Id. at 142, 90 S.Ct. at 847.
 
 
 59
 We first determine whether the Town has imposed any burdens on interstate commerce. We have explained that the "incidental burdens" to which Pike refers "are the burdens on interstate commerce that exceed the burdens on intrastate commerce." New York State Trawlers Ass'n v. Jorling, 16 F.3d 1303, 1308 (2d Cir.1994) (citing Clover Leaf Creamery Co., 449 U.S. at 471-72, 101 S.Ct. at 727-28); see also Pacific Northwest Venison Producers v. Smitch, 20 F.3d 1008, 1015 (9th Cir.) (explaining that "incidental burdens" on interstate commerce include disruption of interstate travel and shipping due to lack of uniformity in state laws, impacts on commerce beyond the borders of the state, or burdens that fall more heavily on out-of-state interests), cert. denied, --- U.S. ----, 115 S.Ct. 297, 130 L.Ed.2d 211 (1994). Although Babylon's takeover of the local commercial garbage market may have some relatively minor effects on both interstate and local commerce, it will not impose any different burdens on nonlocal as opposed to local garbage haulers. That is, while the takeover will result in only one garbage hauler collecting commercial garbage on the Town's behalf in Babylon, the new system will not necessarily increase or decrease interstate commerce in garbage collection. Any impact on interstate commerce would depend on whether a single buyer (the Town), purchasing collection services in bulk for the entire District, would tend to hire out-of-state garbage haulers more often or less often than numerous buyers (Babylon's individual businesses) would have under the old system. Those buyers, like the Town, could have preferred a local garbage hauler to a nonlocal hauler, or vice versa, for any reason: cost, quality of service, or prior business relationship, just to name a few. There is no reason to assume that by shifting all hiring of garbage haulers into the hands of one buyer, the flow of interstate commerce will be reduced, and thereby burdened. In fact, the open bidding process used by the Town to hire a single garbage hauler could readily result in the hiring of an out-of-state garbage hauler--which would actually shift a portion of the garbage collection market into interstate commerce. See Clover Leaf Creamery, 449 U.S. at 473, 101 S.Ct. at 728-29 (observing that although state statute banning nonrecyclable milk containers would presumably cause market disruptions, "there is no reason to suspect that the gainers will be Minnesota firms, or the losers out-of-state firms"). Accordingly, we find that Babylon has imposed no greater burdens on nonlocal firms than it has placed on local firms.
 
 
 60
 The plaintiffs also attack the Town's system of benefit assessments and user fees, on the theory that by forcing local businesses to pay the Town for garbage hauling, businesses will be unwilling to hire a private hauler and essentially pay for garbage collection a second time. But the Town's takeover of the garbage collection system, not the tax system, prevents local businesses from hiring private haulers to pick up their garbage. Even if the Town financed garbage collection for the District from "general revenues"--for example, by increasing the town-wide ad valorem property tax--businesses would still be prohibited from hiring private haulers. Upon closer scrutiny, it becomes clear that the plaintiffs do not seriously challenge the Town's taxation system. Rather, they dispute the use to which the Town has put their tax dollars--to provide garbage collection and disposal services. In this sense, the plaintiffs' challenge to the tax system is really a reformulation of their challenge to the Town's assumption of collection duties in the District. We have already rejected the notion that the Town's provision of exclusive sanitation services places any burdens on interstate commerce, since the Town prohibits all garbage haulers from contracting with local businesses. We likewise reject the notion that this local tax system--typical of local tax systems across the country--places any burdens on interstate commerce.
 
 
 61
 Absent a showing by the plaintiffs that the Town's waste collection system places any extra burden on out-of-state companies, or on local companies engaged in interstate commerce, we must conclude that the Town has not imposed any "incidental burdens" on interstate commerce that "are clearly excessive in relation to the putative local benefits." Pike, 397 U.S. at 142, 90 S.Ct. at 847.
 
 
 62
 We nevertheless note that Babylon has legitimate--indeed, compelling--interests that are served by its waste management program. In our multi-tiered federal system, local governments have historically borne primary responsibility for ensuring the safe and reliable disposal of waste generated within their borders--a role that Congress has expressly recognized. Resource Conservation and Recovery Act ("RCRA"), Sec. 1002(a)(4) (codified at 42 U.S.C. Sec. 6901(a)(4) (1988)). ("[C]ollection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies...."). The Town must meet targets for solid waste recycling set by overlapping state and federal mandates. See, e.g., N.Y.GEN.MUN.LAW Sec. 120-aa (McKinney 1986 & Supp.1994) (requiring local government to enact ordinances mandating source separation of recyclable items from solid waste); see also 40 C.F.R. Sec. 256.31 (1994) (requiring states receiving federal assistance under RCRA to plan for source separation, recycling, and resource conservation). Local governments must enjoy some leeway in coping with the solid waste crisis.
 
 
 63
 3. The Town's Relationship with BSSCI (the Garbage Hauler)
 
 
 64
 The plaintiffs argue that BSSCI is a "single local proprietor" that is favored by Babylon in three ways. As discussed above, they claim primarily that BSSCI enjoys a captive customer base because the Town prohibits other private haulers from competing with it in the local commercial garbage market. Property owners and commercial enterprises, they contend, are thereby forced to do business with the designated garbage hauler. This, they argue, mirrors the situation in Carbone, where the Supreme Court struck down a municipal ordinance that required all town garbage to be processed at a local, privately owned transfer station. --- U.S. at ----, 114 S.Ct. at 1683. We need not revisit our rejection of that argument. BSSCI is merely a contractor hired to collect garbage on the Town's behalf, not a favored seller of garbage collecting services with whom local companies are forced to do business.
 
 
 65
 Plaintiffs raise two further objections to the Town's contract with BSSCI--objections that are somewhat ancillary to the Town's takeover of the garbage collection market. First, the plaintiffs claim that besides a monopoly, BSSCI enjoys an unfair advantage over its competitors because the Town lets it dispose of commercial waste for free at the Incinerator. According to the plaintiffs, this subsidy is comparable to the one invalidated by the Supreme Court in West Lynn Creamery, Inc. v. Healy, --- U.S. ----, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994), where Massachusetts had funnelled revenue from a tax on all milk sold in the state to Massachusetts dairy farmers only. Second, the plaintiffs argue that BSSCI has been the special object of the Town's favor, and that the process for selecting a town garbage hauler was skewed in that firm's direction. We are not persuaded by the analogy to West Lynn Creamery, or by the plaintiffs' allegations of favoritism towards BSSCI. Both the Town's exercise of its dumping rights at the Incinerator and its hiring of a garbage hauler involve a local government spending tax dollars for the benefit of its citizens--paradigmatic examples of "market participation" that are not subject to the limitations of the dormant Commerce Clause. Furthermore, we note that even if the Town's actions constituted "market regulation," they would nevertheless pass muster under the Commerce Clause.
 
 
 66
 a. Market Participation/Market Regulation
 
 
 67
 The Town's decision to let BSSCI dump trash collected in the District for free at the Incinerator constitutes market participation--not discrimination against interstate commerce. As described earlier, the Town effectively owns the Incinerator, and pays Ogden a monthly service fee to operate the facility; the Town owns exclusive rights to dispose of waste there. The Town may exercise those rights as it sees fit. It could sell those rights on the open market. For example, it has entered into a seven-year agreement with the Nassau/Suffolk Hospital Council to burn treated, regulated medical waste at the Incinerator at a rate of $240 per ton. Alternatively, the Town could re-sell those rights only to town residents, just as South Dakota sold cement from its factory only to state residents in Reeves, 447 U.S. at 440, 100 S.Ct. at 2279. Instead, the Town has chosen to give away those rights for free, to dispose of garbage generated by town businesses. Babylon's decision to let BSSCI dump trash for free at the Incinerator therefore constitutes municipal participation in the waste disposal market.
 
 
 68
 Plaintiffs also argue that the process Babylon used to select a particular garbage hauler was skewed in favor of BSSCI, a consortium of Long Island garbage haulers. In other words, plaintiffs argue that the Town's seemingly neutral takeover of the garbage market was in fact a pretense for handing BSSCI a local garbage monopoly. But allegations that the Town favored BSSCI are irrelevant because the market participation doctrine permits the Town to hire whatever company it chooses, on whatever terms it chooses, to provide municipal services. As the Supreme Court has held, "Nothing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 810, 96 S.Ct. 2488, 2498, 49 L.Ed.2d 220 (1976) (footnote omitted); White v. Massachusetts Council of Constr. Employers, 460 U.S. 204, 207, 103 S.Ct. 1042, 1044, 75 L.Ed.2d 1 (1983); see also SSC Corp., 66 F.3d at 510-11. When a local government decides to provide a municipal service such as garbage collection to its residents, it need not buy garbage trucks or put drivers on the town payroll to pass constitutional muster. Instead, it can hire an outside contractor to provide those services to the town. In Massachusetts Council of Construction Employers, for example, the Supreme Court held that the City of Boston could require its building contractors to hire at least fifty percent of their workforce from among Boston residents. 460 U.S. at 214-15, 103 S.Ct. at 1048. Because all of the employees covered by that mandate were "in a substantial if informal sense, 'working for the city,' " Boston was considered to be simply favoring its own residents through the expenditures of municipal funds. Id. at 211 n. 7, 103 S.Ct. at 1046 n. 7. As the Court stated, "when a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause." Id. at 208, 103 S.Ct. at 1044. Nothing in the Constitution precludes a local government from hiring a local company precisely because it is local.
 
 
 69
 b. Discrimination Against, or Burdens on, Interstate Commerce
 
 
 70
 In any event, there is no evidence that Babylon (1) is "subsidizing" BSSCI by allowing it to dump town garbage at the Incinerator for free, or (2) selected BSSCI because it is a consortium of local companies.
 
 
 71
 The plaintiffs' first argument, that the Town is subsidizing BSSCI by letting it dump garbage for free at the Incinerator, ignores economic reality. Although a customer normally pays its garbage hauler once for two services, collection and disposal, Babylon has purchased those services separately. The Town pays BSSCI to collect town garbage, and Ogden to incinerate it. If Babylon had so desired, it could have charged BSSCI "tipping fees" to dump town trash at the Incinerator--as the neighboring town of Smithtown has done. See SSC Corp., 66 F.3d at 505. By charging fees at the Incinerator, the Town could eliminate its hauler's arguable incentive to insinuate non-contract garbage into the garbage it dumps for free at the Incinerator. See id. at 515. But if BSSCI had to pay to dispose of town garbage, it would have passed those costs back to Babylon in a higher bid. The Town therefore saves money in its contract with BSSCI by letting it dump for free at the Incinerator. The disposal component of the contract is therefore a wash--not a subsidy--for BSSCI.
 
 
 72
 Likewise, plaintiffs' allegations of bias in favor of BSSCI are so insubstantial that, even if the Town's hiring of a garbage hauler were subject to the limitations of the dormant Commerce Clause, we would nevertheless conclude that the Town's selection of BSSCI neither discriminated against nor imposed any burden on interstate commerce. Babylon conducted an open bidding process to find a garbage hauler for its District, pursuant to Sec. 120-w(4)(e) of the New York General Municipal Law (McKinney 1986). According to an undisputed affidavit of the Town Comptroller, the Town "aggressively solicited proposers from a national audience" by sending out bid packages to sixty-nine companies across the country, twenty-four of which were based outside New York. The Town also notified national trade publications of the bidding process, spoke with representatives of industry trade groups such as the Solid Waste Association of North America, and contacted national waste hauling firms by telephone to generate interest in bidding. Furthermore, the Town did not impose any geographical eligibility limitations on those who bid to provide collection services in the District.
 
 
 73
 The plaintiffs argue that, despite these efforts to generate nationwide interest in bidding, the Town skewed the selection process in favor of BSSCI, which was ultimately awarded the contract to collect commercial garbage within the District. In evaluating the various bids that were submitted, the Town Board placed significant weight on whether the bidder had "[e]xperience identical to or related to that required under this procurement" and "[e]xperience in transition and implementation of services identical to or similar to services required under this procurement." BSSCI received the highest marks in that category, since its principals had already proven their ability to start up a new collection system smoothly and efficiently as members of the consortium serving as the town's garbage hauler in the Babylon Residential District. Furthermore, the draft contract contained in the request for proposals required successful bidders to maintain a local office in Babylon and to keep off-duty garbage trucks "parked securely in a central yard, established by the Contractor, within the Town of Babylon."
 
 
 74
 Despite the plaintiffs' protestations to the contrary, none of these factors detracted from the nondiscriminatory nature of the Town's bidding process, or resulted in any undue burdens on interstate commerce. First, plaintiffs neglect to mention that the Town selected BSSCI not only because of its prior experience hauling garbage in Babylon, but also because it submitted the lowest-priced bid. Indeed, the Town considered the relative merits of the submitted bids according to several distinct criteria, including cost, prior experience, ability to provide equipment and support services on the schedule requested by the Town, and ability to meet financial obligations. Second, the requirement of maintaining a secured parking lot and a local office can hardly be considered discrimination against interstate commerce. At most, such a requirement would amount to a burden on nonlocal firms that would have to establish in-town service locations if awarded the contract. But such burdens are de minimis when we consider the fact that the chosen hauler must, by the nature of the garbage collection services, pick up garbage locally--from businesses situated within the Town. Because the hauler's trucks must be available at a moment's notice to provide back-up service within the District, their geographic proximity to the District is a sine qua non of the contract. Furthermore, as the Town explains, local officials can more easily monitor the garbage hauler's performance of its contractual duties--including the maintenance of a dedicated fleet of collection vehicles--if those vehicles are kept in a single location accessible for inspections. Similarly, the maintenance of a local office will also enable consumers to file complaints more readily, as well as to ensure that the contractor is responsive to local needs. In short, the requirement that these support services (purchased by the town) be provided locally places nothing more than a de minimis burden on interstate commerce--a burden which is far outweighed by the nondiscriminatory local interests served by ensuring reliable, consistent sanitation service to town businesses.
 
 
 75
 4. The Town's Relationship with Ogden (the Incinerator Operator)
 
 
 76
 The plaintiffs also argue that the garbage disposal component of the Town's waste management plan impermissibly favors the Incinerator over all other in-state and out-of-state disposal facilities. First, they contend that the Town has effectively guaranteed that all District waste will be disposed of at the Incinerator by letting BSSCI dump commercial waste there for free. This, they contend, has closed off the local commercial garbage market to out-of-state competition. Second, they argue that the benefit assessments and user fees charged by the Town against property and businesses in the District, coupled with the use of those funds to support operation of the Incinerator, constitutes a tax-and-subsidy scheme that discriminates against interstate commerce like the one struck down in West Lynn Creamery, --- U.S. at ----, 114 S.Ct. at 2205. We address each argument in turn.
 
 
 77
 a. Market Participation/Market Regulation
 
 
 78
 First, we conclude that the Town is engaging in market participation both when it purchases incinerating services from Ogden, and when it exercises its rights to use those services by letting BSSCI dump town garbage at the Incinerator for free. The Town acts as a buyer in the market for incinerating services when it uses tax dollars to repay municipal bonds and to pay Ogden to operate the Incinerator. This is a simple act of government procurement. As the Supreme Court has observed, "[t]here is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market." Reeves, 447 U.S. at 437, 100 S.Ct. at 2277.
 
 
 79
 Having bought those incinerating services, the Town may use them as it chooses. As discussed earlier, the Town sells some incinerating services to a local hospital council for the disposal of medical waste. Instead of selling the remainder of its rights to use the Incinerator, the Town uses them to dispose of trash that BSSCI collects from the commercial garbage improvement district. (The Town also may reserve some of the disposal rights for garbage from its residential garbage district, but the details of residential collection and disposal are not before us.) The Town is acting completely within the proper bounds of its discretion when it charges BSSCI nothing to use those rights.
 
 
 80
 The district court correctly observed that by letting BSSCI dump garbage for free at the Incinerator, the Town has created "not only a powerful, but virtually an irresistible incentive to dispose of the waste at the town facility." By lowering its tipping fees to zero, the Town has guaranteed a flow of garbage to its Incinerator. But local governments are perfectly free, as market participants, to use economic incentives to benefit local businesses. We repeat the Supreme Court's observation in Alexandria Scrap that the Commerce Clause poses no barrier to a state "participating in the market and exercising the right to favor its own citizens over others." 426 U.S. at 810, 96 S.Ct. at 2498. This is perfectly consistent with Carbone, as well. Indeed, what some commentators have labelled "economic flow control" is precisely what Justice O'Connor suggested would be fully consonant with the majority's holding in Carbone. --- U.S. at ----, 114 S.Ct. at 1690 (O'Connor, J., concurring) (suggesting that Clarkstown could have financed its transfer station "by lowering its price for processing to a level competitive with other waste processing facilities"); see Eric S. Petersen & David N. Abramowitz, Municipal Solid Waste Flow Control in the Post-Carbone World, 22 FORDHAM URB.L.J. 361, 404 (1995) ("Economic flow control is achieved when haulers deliver solid waste to a facility because the costs of disposal at the facility, including transportation costs and tipping fees, are less than or comparable to those at alternative disposal sites.").
 
 
 81
 b. Discrimination Against, or Burdens on, Interstate Commerce
 
 
 82
 The plaintiffs reply that even if the Town's purchase of incinerating services does constitute market participation, its financing of those incinerating services through property taxes and user fees nevertheless constitutes an unconstitutional "regulation" of interstate commerce. In support of their argument, the plaintiffs claim that Babylon's taxing scheme is no different from the one struck down in West Lynn Creamery. In that case, Massachusetts imposed a facially neutral tax on all milk sold in the state. All of the money collected was then distributed to in-state dairy farmers. The effect of the scheme, the Supreme Court found, was to increase local producers' share of the state milk market. The Court also rejected the state's argument that its program was valid because neither the tax on the one hand, nor the subsidy on the other, independently violated the dormant Commerce Clause:
 
 
 83
 [The state's] argument would require us to analyze separately two parts of an integrated regulation, but we cannot divorce the premium payments from the use to which the payments are put. It is the entire program--not just the contributions to the fund or the distributions from that fund--that simultaneously burdens interstate commerce and discriminates in favor of local producers. The choice of constitutional means--nondiscriminatory tax and local subsidy--cannot guarantee the constitutionality of the program as a whole.
 
 
 84
 --- U.S. at ----, 114 S.Ct. at 1702. Unlike the Massachusetts milk scheme, however, Babylon's financing system does not "subsidize" BSSCI or Ogden. Instead, the Town spends its tax revenues to purchase services for town residents--a traditional, and unexceptionable, municipal activity. Babylon buys garbage collection services from BSSCI and incinerating services from Ogden. Nor, as explained earlier, does the Town subsidize BSSCI by letting it dump town garbage for "free" at the Incinerator; rather, the Town pays less to BSSCI in the first place for collecting garbage because BSSCI does not have to pay for garbage disposal. If anyone is "subsidized" by the user fees, it is the municipal treasury--not any private business. And that, of course, is the point of every tax.
 
 
 85
 Thus, although we agree that the Town's tax system constitutes "regulation," we disagree that it has any discriminatory effect, or that it impermissibly burdens interstate commerce. To the contrary, we believe that the Town of Babylon has taken to heart the Supreme Court's admonition in Carbone that if "special financing is necessary to ensure the long-term survival" of the incinerator, then "the town may subsidize the facility through general taxes or municipal bonds." --- U.S. at ----, 114 S.Ct. at 1684. Babylon has employed both taxes and bonds. It levies a $1500 flat tax on all improved commercial properties in the district, as well as a "user fee" for each cubic yard of garbage generated on each parcel above a fixed base amount. We believe that both of these charges qualify as the sort of taxes the Supreme Court had in mind in Carbone. Although most municipalities raise the bulk of their funds through ad valorem property taxes, many also employ income or sales taxes, as well as special levies designed to pay for specific municipal services like schools, roads, fire fighting, or sewer service. It is not remarkable, therefore, to see a town create a waste control district and to spread its costs among those who reap the benefit of services provided in that district. The $1500 flat property tax is perhaps a rough estimate of the benefit accorded to each parcel of property in the district; but plaintiffs do not contend that it is out of all proportion to the benefit conferred on each parcel. The per-cubic-yard user fee, by contrast, corresponds much more closely to the benefit enjoyed by each waste generator in the District. Each business pays tax on the garbage they generate, above a fixed amount. Not only is this tax fairer than an ad valorem tax--because it taxes businesses based on the actual amount of municipal services they consume--but it also creates a greater incentive for businesses to reduce the amount of waste they generate. We cannot take exception to either of these purposes of Babylon's tax system.
 
 
 86
 5. Municipal Reliance on Long-Standing Precedent
 
 
 87
 Finally, we note that we must decide this case against the backdrop of two venerable, and until now unchallenged, decisions of the Supreme Court. In California Reduction Co. v. Sanitary Reduction Works, 199 U.S. 306, 26 S.Ct. 100, 50 L.Ed. 204 (1905), and Gardner v. Michigan, 199 U.S. 325, 26 S.Ct. 106, 50 L.Ed. 212 (1905), the Court upheld the authority of San Francisco and Detroit to grant exclusive rights to collect and dispose of garbage within the city to single scavenger companies, who in turn would incinerate the garbage. The Court rejected takings and due process challenges to those systems. Justice Harlan, speaking for the Court, spoke of the pressing need for municipalities to enjoy some flexibility in formulating solutions to the waste disposal crises then facing them:
 
 
 88
 Many of the questions involved in municipal sanitation have proved to be difficult of solution. There is no mode of disposing of garbage and refuse matter, as found in cities and dense populations, which is universally followed. In some cities garbage receptacles, properly covered, are provided, sometimes by the householder, sometimes by the municipal authorities or the garbage collector. But even such devices often prove to be worthless for want of proper attention to them by householders. Then, the question arises for the consideration of the municipal authorities as to the frequency of the removal of garbage. The practice of not at all uniform. In some cities, it is collected seven times a week; in others, six, four, and three times a week. Again, questions arise as to the mode in which garbage should be collected; and the statement is made by those who have investigated the subject, that while "there appears a well-nigh unanimous demand on the part of health officers, and oftentimes of the public generally, for the municipal collection of garbage," the "problem of garbage disposal has not been solved." ...
 
 
 89
 These references to the different methods employed to dispose of garbage and refuse have been made in order to show that the Board had before them a most difficult problem--unsolved by experience or science--as to the best or most appropriate method of protecting the public health in the matter of the disposal of the garbage, refuse and other materials found on private premises, and in hotels, restaurants and like places. The State, charged with the duty of safeguarding the health of its people, committed the subject to the wisdom and discretion of the Board of Supervisors. The conclusion it reached appears in the ordinances in question, and the courts must accept it, unless these ordinances are, in some essential particular, repugnant to the fundamental law.
 
 
 90
 California Reduction, 199 U.S. at 320-21, 26 S.Ct. at 104 (citation omitted). These rulings of the Supreme Court have engendered important reliance interests at the state and local level. The New York Court of Appeals, for example, long ago declared that a municipality could pass an ordinance prohibiting the collection of garbage by persons unlicensed by its health department, and then declare that no licenses should be granted except to the person having a contract with the city for the collection of garbage. City of Rochester v. Gutberlett, 211 N.Y. 309, 317, 105 N.E. 548 (1914) ("Experience has shown that, when there are many collectors of garbage within a municipality acting independently although under license, it is difficult to maintain the supervision necessary to preserve the public health; while, with one contractor acting under a contract pursuant to which he is paid and for the faithful performance of which he is required to give a bond with sureties, the public health can be and is better and more surely protected."); id. at 318-20, 105 N.E. 548 (relying on California Reduction and Gardner ). The challenges associated with sanitary waste disposal have not diminished in the last ninety years. Local governments have continued to shoulder the primary responsibility for solving waste disposal problems--a role that has been recognized by Congress. See, e.g., Resource Conservation and Recovery Act Sec. 1002(a)(4) (codified at 42 U.S.C. Sec. 6901(a)(4)) (1988) (congressional finding that "collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies" supplemented by federal financial and technical assistance).
 
 
 91
 We recognize that the Supreme Court was not faced with Commerce Clause challenges to the Detroit and San Francisco waste disposal systems, and that those cases do not dispose of the much narrower issues we are faced with today. See, e.g., Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 529, 79 S.Ct. 962, 967-68, 3 L.Ed.2d 1003 (1959) ("Local regulations which would pass muster under the Due Process Clause might nonetheless fail to survive other challenges to constitutionality that bring the Supremacy Clause into play. Like any local law that conflicts with federal regulatory measures, state regulations that run afoul of the policy of free trade reflected in the Commerce Clause must also bow.") (citations omitted); Quill Corp. v. North Dakota, 504 U.S. 298, 312, 112 S.Ct. 1904, 1913, 119 L.Ed.2d 91 (1992) (distinguishing between Due Process and Commerce Clauses). Yet we cannot brush aside two Supreme Court precedents that dealt with waste disposal systems so similar to the one before us today. If we were to rule in plaintiffs' favor, the municipal garbage systems upheld by the Court in California Reduction and Gardner would be unconstitutional, and municipalities could no longer undertake the traditional local governmental function of collecting town garbage.
 
 
 92
 We decline the invitation to derive such a revolutionary proposition from the Supreme Court's decision in Carbone--an opinion that described itself as unremarkably invalidating "just one more instance of local processing requirements" that the Court had long held invalid. --- U.S. at ----, 114 S.Ct. at 1682. As Chief Justice Marshall once wrote, "an opinion which is to overrule all former precedents, and to establish a principle never before recognized, should be expressed in plain and explicit terms. A mere implication ought not to prostrate a principle which seems to have been so well established." United States v. Burr, 25 F.Cas. 55, 165 (C.C.D.Va.1807) (No. 14,693). We refuse to undercut the longstanding precedents of California Reduction and Gardner absent clear indication from the Supreme Court that the Commerce Clause is now to be interpreted to effectively preclude local governments from providing basic sanitation services such as garbage collection on an exclusive basis, and financing those services by taxing local residents.
 
 
 93
 We therefore conclude that the plaintiffs have failed to state a viable claim under the Commerce Clause, and therefore have not demonstrated that they are likely to succeed on the merits. Furthermore, we note that the defendants moved for dismissal in the district court, that the parties have exhaustively briefed the issues before us, and that the Commerce Clause claims may be resolved as a matter of law. Accordingly, we find that
 
 
 94
 this is an appropriate case for invoking the doctrine of Smith v. Vulcan Iron Works, 165 U.S. 518, 525, 17 S.Ct. 407, 410, 41 L.Ed. 810 (1897); North Carolina Railroad Co. v. Story, 268 U.S. 288, 292, 45 S.Ct. 531, 532, 69 L.Ed. 959 (1925); and CES Publishing Corp. v. St. Regis Publications, Inc., 531 F.2d 11, 15 (2 Cir.1975), that when on appeal from the grant of a preliminary injunction it appears that the "bill had no equity to support it", 165 U.S. at 525, 17 S.Ct. at 410, a court of appeals should direct dismissal of the complaint.
 
 
 95
 Friarton Estates Corp. v. City of New York, 681 F.2d 150, 160-61 (2d Cir.1982); see Aerojet-General Corp. v. American Arbitration Ass'n, 478 F.2d 248, 252-53 (9th Cir.1973); see also 16 CHARLES A. WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER & EUGENE GRESSMAN, FEDERAL PRACTICE AND PROCEDURE Sec. 3937, at 269 (1977) ("On appeal from grant or denial of a preliminary injunction, ... it may make excellent sense to determine whether the complaint states a claim on which relief can be granted."). We therefore direct dismissal of the plaintiffs' Commerce Clause claims.
 
 C. Irreparable Harm
 
 96
 Finally, we address the district court's unusual decision to grant preliminary injunctive relief despite its explicit finding that plaintiffs would not suffer any irreparable harm as a result of the implementation of Babylon's solid waste management plan.
 
 
 97
 It is settled law in our Circuit that, as a general matter, a plaintiff must make a showing of irreparable harm before a court may issue preliminary injunctive relief. See Polymer Technology Corp. v. Mimran, 37 F.3d 74, 77-78 (2d Cir.1994). Nevertheless, the district court stated that it would "grant the motion for injunction, notwithstanding the fact that I don't think irreparable harm has been shown." We have described a showing of irreparable harm as the sine qua non for preliminary injunctive relief, Buffalo Forge Co. v. Ampco-Pittsburgh Corp., 638 F.2d 568, 569 (2d Cir.1981), and such a departure from established precedent clearly constitutes an abuse of discretion. See JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir.1990) (reversing grant of preliminary injunction where district court found only "possibility" rather than "likelihood" of irreparable harm).
 
 
 98
 Although plaintiffs concede that the district court misapplied the standards for granting equitable relief, they nevertheless urge us to comb the record for facts that would support a finding of irreparable harm. It is true that we may affirm "on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely." Leon v. Murphy, 988 F.2d 303, 308 (2d Cir.1993). In this case, however, the district court explicitly found that plaintiffs had not demonstrated irreparable harm. We could only affirm the preliminary injunction, then, by determining that the district court's factual finding was "clearly erroneous." Because the record supports the district court's determination that plaintiffs' alleged injuries would be entirely financial--and therefore remediable by an award of money damages--we cannot say that the district court clearly erred when it found that the plaintiffs had not demonstrated irreparable harm.
 
 III. CONCLUSION
 
 99
 This case boils down to two simple propositions. First, towns can assume exclusive responsibility for the collection and disposal of local garbage. Second, towns can hire private contractors to provide municipal services to residents. In neither case does a town discriminate against, or impose any burden on, interstate commerce. The local interests that are served by consolidating garbage service in the hands of the town--safety, sanitation, reliable garbage service, cheaper service to residents--would in any event outweigh any arguable burdens placed on interstate commerce.
 
 
 100
 In summary, we uphold Babylon's waste management system. We reverse the district court's entry of the preliminary injunction, and dismiss the plaintiffs' claims under the Commerce Clause because:
 
 
 101
 1. The plaintiffs failed to establish a likelihood of success on the merits, because the Town's waste management scheme does not violate the dormant Commerce Clause; and
 
 
 102
 2. Evidence in the record supports the district court's finding that plaintiffs will not suffer irreparable harm from implementation of the Town's waste management plan.
 
 
 103
 Accordingly, we dismiss plaintiffs' claims under the Commerce Clause, as well as plaintiffs' civil rights claims premised upon violations of the Commerce Clause. The plaintiffs in USA Recycling, Inc. v. Town of Babylon, No. 95-7129, raise additional claims under various statutory and constitutional provisions. The plaintiffs in A.A. & M. Carting Service, Inc. v. Town of Babylon, No. 95-7131, arguably raise a claim under the Sherman Act. We therefore remand for further proceedings on any remaining claims, consistent with this opinion.
 
 
 
 [1]
 1983 N.Y.Laws 299 (codified at N.Y.ENVTL.CONSERV.LAW Sec. 27-0704 (McKinney 1984)). The Long Island Landfill Law phased out the practice of landfilling raw garbage, prohibited development of new landfills in deep flow groundwater recharge zones, and designated resource recovery, incineration, or composting as the preferred alternatives for disposal of municipal solid waste
 
 
 [2]
 Section 27-0106 provides as follows:
 In the interest of public health, safety and welfare and in order to conserve energy and natural resources, the state of New York, in enacting this section, establishes as its policy that:
 
 
 [1]
 The following are the solid waste management priorities in this state:
 (a) first, to reduce the amount of solid waste generated;
 (b) second, to reuse material for the purpose for which it was originally intended or to recycle material that cannot be reused;
 (c) third, to recover, in an environmentally acceptable manner, energy from solid waste that can not be economically and technically reused or recycled; and
 (d) fourth, to dispose of solid waste that is not being reused, recycled or from which energy is not being recovered, by land burial or other methods approved by the department.
 
 
 [2]
 State government must make an essential contribution to the development and implementation of environmentally, economically and technically viable solid waste management programs through fulfilling its responsibilities to provide programs which promote waste reduction and the expansion of markets for recovered materials, clearly articulated, responsive and consistently applied regulatory structures, and a full range of technical assistance to local governments. A state-local partnership, in which the basic responsibility for the planning and operation of solid waste management facilities remains with local governments and the state provides necessary guidance and assistance, must be forged
 
 
 [3]
 This policy, after consideration of economic and technical feasibility, shall guide the solid waste management programs and decisions of the department and other state agencies and authorities
 
 
 [3]
 New York General Municipal Law Sec. 120-w(4)(e) (McKinney 1986) sets forth a detailed bidding process for such contracts, indicating what information must be included in bid proposals, requiring notice and comment on the town's request for proposals, and establishing guidelines for evaluating submitted bids
 
 
 [4]
 See N.Y.GEN.MUN.LAW Secs. 850-888 (McKinney 1986 & Supp.1994) (describing purpose, organization, and general powers of industrial development agencies); id. Sec. 907-a (McKinney 1986) (establishing Babylon IDA). Under New York law, the purposes of an industrial development agency
 shall be to promote, develop, encourage and assist in the acquiring, constructing, reconstructing, improving, maintaining, equipping and furnishing [of] industrial, manufacturing, warehousing, commercial, research and recreation facilities including industrial pollution control facilities, educational or cultural facilities, railroad facilities and horse racing facilities and thereby advance the job opportunities, health, general prosperity and economic welfare of the people of the state of New York and to improve their recreation opportunities, prosperity and standard of living....
 Id. Sec. 858. The Agency's governing board is appointed by the Babylon Town Board, and each member "serve[s] at the pleasure of the appointing authority." Id. Sec. 856(2).
 
 
 [5]
 The New York State Legislature specifically authorized Babylon to enact such a flow control ordinance
 [T]he town of Babylon is authorized to adopt and amend a local law to be known as the solid waste management law. Such law shall provide for the management on a town-wide basis of all solid waste generated within the town of Babylon....
 Sec. 2. It is hereby declared to be the policy of the state of New York with respect to the collection, transportation, delivery, storage, processing and disposal of solid waste in the town of Babylon, in the county of Suffolk, to displace competition with regulation or monopoly public service. In furtherance of this policy, the town of Babylon is hereby authorized to adopt a local law (1) to exclusively control all solid waste and all energy and materials derived therefrom, including without limitation the collection, transportation and delivery of solid waste to a designated resource recovery facility or facilities within the town of Babylon for storage or processing or for any other disposition or handling; and (2) to provide for the establishment and collection from time to time of charges as compensation for the service of disposing or handling of such solid waste, all in order to assure a regular solid waste collection and disposal or handling service for the people of the town of Babylon.
 1985 N.Y.Laws 478, Secs. 1-2.
 
 
 [6]
 The Town described the extent of the District in its Final Request for Proposals for commercial waste collection and recycling services:
 The Commercial Garbage District encompasses the entire geographic area of the Town of Babylon, and includes all parcels not included in the Residential Solid Waste District (all improved residential parcels, 3 families or less) and excluding the Incorporated Villages of Amityville, Babylon and Lindenhurst; all vacant residential land; all land (improved and unimproved) owned by the United States Government, State, County, Town and Villages; but not schools, fire, ambulance, water and library districts. Within the geographic limits of the unincorporated Town of Babylon, the Town classification of property in June 1994 showed fewer than 7,000 parcels which would comprise the Commercial Garbage District.
 Final Request for Proposals at 3-4.
 
 
 [7]
 In 1986, the Town created a Residential Garbage Improvement Area (the "Residential District") to provide municipal garbage collection and disposal services to all town residents, pursuant to New York Town Law Secs. 54, 198 (McKinney 1965 & Supp.1986). The Residential District consists of the unincorporated area of the Town outside the Villages of Amityville, Babylon, and Lindenhurst, and outside any previously existing refuse and garbage districts. In December 1987, after another competitive bidding process pursuant to New York General Municipal Law Sec. 120-w(4)(e) (McKinney 1986), the Town contracted with Babylon Source Separation, Inc., to collect residential refuse and to provide recycling services in the Residential District. For reasons that are not clear, the plaintiffs do not challenge the creation of the Residential District
 
 
 [8]
 The Town would grant BSSCI the only Class 2 license, which authorizes a hauler to collect and transport all wastes, except construction and demolition debris, within the District. Such a license can be granted only to a carter that has a contract with the Town. Local Law No. 2 of 1995 (to be codified at BABYLON CODE Sec. 133-14(B))
 Other carters, including plaintiffs, are still eligible to apply for Class 1 and 3 licenses. A Class 1 license authorizes a hauler to collect and transport nonrecyclable waste outside an improvement district, and to collect and transport recyclable waste from the improvement district only "if properly authorized by the property owner." Id. Sec. 133-14(A). A Class 3 license authorizes a hauler to collect and transport construction and demolition debris anywhere in the Town. Id. Sec. 133-14(C).
 
 
 [9]
 It appears from the record that the Town, at the direction of the district court, has refrained from filing these amendments with the New York Secretary of State, a ministerial act required for the changes to take effect. See N.Y.MUN.HOME RULE LAW Sec. 27(3) (McKinney 1994)
 
 
 [10]
 For further discussion of Commerce Clause jurisprudence, we refer the reader to our opinion in SSC Corp v. Town of Smithtown, 66 F.3d 502 (2d Cir.1995), filed simultaneously herewith
 
 
 [11]
 We do not hold that the Town has assumed an enforceable duty to collect or dispose of other types of waste, such as construction and demolition debris, that private haulers are still licensed to collect. Nor do we address the situation of a town that provides garbage collection services but does not exclude those within its jurisdiction from entering into individual contracts for waste collection
 
 
 [12]
 There is no reason to assume that by "general taxes" the Supreme Court meant "general revenue taxes"--that is, taxes that are commingled with other municipal revenues. The courts have generally distinguished "special assessments" from "general revenue taxes" not when determining whether those fees discriminate against interstate commerce, but rather, when determining whether they are "fairly related to services provided to the State"--one of four requirements which a state tax must satisfy to survive a Commerce Clause challenge under Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977). According to Complete Auto Transit, a state tax is valid if it "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." Id. General revenue taxes satisfy the fourth prong of the Complete Auto Transit test so long as they are reasonably related to the extent of the taxpayer's contacts with the State. The courts will not inquire as to whether the state's gross receipts from a "general revenue tax" match, dollar for dollar, the benefits returned to the taxpayer. Commonwealth Edison Co. v. Montana, 453 U.S. 609, 625-28, 101 S.Ct. 2946, 2957-59, 69 L.Ed.2d 884 (1981). Special assessments and user fees, by contrast, which "are purportedly assessed to reimburse the State for costs incurred in providing specific quantifiable services," are subject to a somewhat more demanding standard. Id. at 622 n. 12, 101 S.Ct. at 2956 n. 12. Those taxes must not be " 'manifestly disproportionate to the services rendered' " by the state. Id. (quoting Clark v. Paul Gray, Inc., 306 U.S. 583, 599, 59 S.Ct. 744, 753, 83 L.Ed. 1001 (1939)). Because it is undisputed that the Town uses all of the revenue from its user fees and benefit assessments to defray its expenses in providing garbage services to the District, we cannot conclude that the amount of those assessments is "manifestly disproportionate" to the benefits the Town confers in return. Cf. Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc., 405 U.S. 707, 719-20, 92 S.Ct. 1349, 1356-57, 31 L.Ed.2d 620 (1972) (upholding state and municipal head tax on airline passengers to defray costs of airport construction and maintenance, in part because plaintiffs failed to show fees "to be excessive in relation to costs incurred by the taxing authorities"). In any event, the plaintiffs do not explicitly press the argument that the Town's two assessments would be invalid under Complete Auto Transit, but rather, focus on the fact that the fees are not imposed on both commercial and residential entities throughout the entire Town
 
 
 [13]
 The New York Legislature has also authorized specified local governments to establish other types of improvement districts. For example, any town in Suffolk County is authorized to create a special improvement district for the disposal of duck waste. N.Y. TOWN LAW Sec. 198-a (McKinney 1987). The town may charge users and property owners (usually, those who operate and own duck farms) within the district "duck waste charges" based on the volume of duck waste the Town treats, or upon any other equitable basis that the town board chooses. Id. Sec. 198-a(2)
 Duck waste districts (whence, presumably, the phrase "down in the dumps") might be said to enjoy a special nexus with foreign commerce. Cf. Missouri v. Holland, 252 U.S. 416, 434-35, 40 S.Ct. 382, 384, 64 L.Ed. 641 (1920) (upholding Migratory Bird Treaty Act, 40 Stat. 755 (1918), pursuant to congressional power to implement treaties, and describing migratory birds as a "national interest of very nearly the first magnitude" since they are both "a food supply" and "the protectors of our forests and our crops").