SAL TINNERELLO & SONS, INC., Plaintiff–Appellant,

v.

TOWN OF STONINGTON; Stonington Resource Recovery Authority; and Donald R. Maranell, First Selectman, Defendants–Appellees.

Docket No. 97–7919.

United States Court of Appeals, Second Circuit.

Argued Nov. 5, 1997.

Decided April 3, 1998.

---

Eliot B. Gersten, Gersten & Clifford, Hartford, CT (John P. Clifford, Jr., Gersten & Clifford, Hartford, CT; Aviva Cuyler, Petaluma, CA, on the brief), for Plaintiff–Appellant.

Robert D. Tobin, Tobin, Carberry, O'Malley, Riley & Selinger, P.C., New London, CT (Thomas J. Riley, Susan L. DiMaggio, Tobin, Carberry, O'Malley, Riley & Selinger, P.C., New London, CT, on the brief), for Defendants–Appellees.

Before: MINER and PARKER, Circuit Judges, and DEARIE, District Judge.*

MINER, Circuit Judge:

Plaintiff-appellant Sal Tinnerello & Sons, Inc. ("Tinnerello") appeals from an order of the United States District Court for the District of Connecticut (Chatigny, J.) denying its motion for a preliminary injunction to prevent the defendants, Town of Stonington ("Stonington" or the "Town"), Stonington Resource Recovery Authority (the "Authority") and Donald R. Maranell, First Selectman of Stonington's Board of Selectmen, from enforcing an ordinance creating the Authority and providing that (1) the Authority or solid waste collectors with whom the Authority has contracted will remove, transport and dispose of all commercial solid waste generated in Stonington and (2) all others are prohibited from removing, transporting or disposing of such waste. The order was grounded on the district court's view that Tinnerello had failed to make a sufficient showing of irreparable harm or likelihood of success on the merits of its claims brought under the Contract and Commerce Clauses of the United States Constitution.

For the reasons that follow, we affirm the order of the district court which is the subject of this appeal.

## BACKGROUND

In 1973, the Connecticut General Assembly created the Connecticut Resources Recovery Authority (the "CRRA"), a public instrumentality and political subdivision of the State of Connecticut. The CRRA was charged with the task of replacing Connecticut's landfills with incinerator or "waste-to-energy" facilities.[1] Pursuant to the State Solid Waste Management Plan (the "State Plan"), six incinerators have been built at various locations throughout the State of Connecticut. Stonington, a town in southeastern Connecticut, together with approximately thirteen other towns in the region, is a member of the Southeastern Connecticut Regional Resource Recovery Authority (the "SCRRRA"). The SCRRRA is a public instrumentality and political subdivision of the State of Connecticut operating at the local level. In 1992, the SCRRRA constructed an incinerator in Preston, Connecticut ("Preston") to serve the disposal needs of SCRRRA member towns.

Construction of the Preston facility was financed through the sale of bonds issued by the CRRA. Stonington, consistent with the State Plan, undertook to participate in the construction of the Preston incinerator in order to provide a safe and efficient means of disposing of its solid waste. Stonington and the other member towns each entered into a written contract with the SCRRRA, the terms of which are substantially the same. Under the terms of its contract dated No-

---

* The Honorable Raymond J. Dearie, of the United States District Court for the Eastern District of New York, sitting by designation.

1. "Waste-to-energy" facilities burn solid waste, generating energy that is sold to utility companies.

vember 13, 1985, Stonington guaranteed delivery of an annual minimum amount of solid waste to the Preston incinerator. The purpose of the minimum commitment is to ensure a flow of funds to the SCRRRA sufficient for proper operation of the facility and payment of the bond commitments.

Stonington's minimum commitment to the Preston facility is 10,149 tons of residential and commercial solid waste per year. Residential collections in Stonington, on average, yield 3,000 to 4,000 tons. Stonington depends on collections from commercial accounts to provide the rest of the required solid waste, approximately 6,000 tons per year. If such an amount is not delivered, the Town must pay the equivalent of the cost of disposing of that portion of the minimum commitment which was not delivered. Stonington's full faith and credit backs the commitment.

The contract between Stonington and the SCRRRA also provided that the former would enact a flow control ordinance requiring all waste haulers collecting within Stonington's borders to utilize the Preston facility. At the Preston facility, the haulers would have to pay a "tipping fee"[2] for each ton of solid waste dumped. The waste delivered by these private haulers would be credited towards satisfaction of the Town's minimum commitment. Stonington adopted a flow control ordinance, as was contractually required. In May of 1994, however, the Supreme Court held that flow control ordinances were violative of the Commerce Clause of the United States Constitution. *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). Moreover, in December of 1995, a district court in this Circuit en-

joined enforcement of the flow control ordinance adopted by the Town of East Lyme, Connecticut, another member of the SCRRRA, on the ground that the ordinance violated the Commerce Clause. *See Connecticut Carting Co. v. Town of East Lyme*, 946 F.Supp. 152 (D.Conn.1995). Tinnerello, a closely-held company that conducts waste-hauling operations throughout southeastern Connecticut, was a party to that case as well. *See id.*

Subsequent to the ruling in *Connecticut Carting*, the volume of solid waste delivered to the Preston facility dropped substantially.[3] No longer legally compelled to bring waste to Preston, private haulers avoided the facility and disposed of their waste at other places, including transfer stations in the State of Rhode Island, where rates were lower than those charged by Preston.[4] For example, the tipping fee charged by Preston was approximately $79 per ton, compared with the $52 per ton fee charged by facilities in Rhode Island.

In early December of 1996, Stonington began to investigate the possibility of a municipal takeover of the function of commercial waste collection and disposal. A consultant retained for the purpose of studying options available to Stonington suggested that the municipality: (1) assume responsibility for collecting all commercially generated solid waste; (2) contract with one or more private haulers to make the collections; (3) require that the contractors take the waste to Preston; and (4) impose a special assessment on the generators of the waste to recover the cost of the program. The consultant noted that lower tipping fees might be the only thing necessary to get the private haulers to

---

**2.** "Sometimes referred to as a gate fee or disposal charge, the term 'tipping fee' is derived from the fact that trucks delivering waste must 'tip' the back-end of the truck to drop off the waste." Eric S. Petersen & David N. Abramowitz, *Municipal Solid Waste Flow Control in the Post–Carbone World*, 22 Fordham Urb. L.J. 361, 369 n.46 (1995).

**3.** Presumably Stonington's flow control ordinance was repealed subsequent to the *Connecticut Carting* ruling.

**4.** Defendants-appellees assert that because waste was being delivered to transfer stations rather

than disposal sites, Stonington had no knowledge of, or control over, the ultimate disposition of the waste. This, in turn, rendered the municipality vulnerable to liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a)(1988), in that the Town arranged for the disposal and treatment of municipal solid waste. *See B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1199 (2d Cir.1992)(holding municipalities subject to "arranger" liability under CERCLA).

dump at Preston voluntarily. However, his report pointed out that such lower fees would have to be subsidized with tax dollars, and that, in any event, this measure would not guarantee that solid waste would be taken to Preston.

By March of 1997, little of Stonington's commercial waste was being delivered to the Preston incinerator. Town officials believed that if action were not taken, Stonington would lose all remaining commercial waste to disposal sites other than Preston. Therefore, the officials considered three options: (1) take no action and fund the shortfall in the minimum commitment through a tax increase of about $500,000;[5] (2) lower the tipping fee paid by private haulers to meet the market price by subsidizing the Preston fee through tax increases imposed on the general public; or (3) assume control over waste collection either by hiring municipal employees and purchasing equipment or by using private contractors. Based on the recommendation outlined by their consultant, Stonington officials concluded that the Town should assume the function of collecting commercial solid waste and use private haulers since it would (1) allow the Town to control the disposal of its solid waste without imposing a tax increase; (2) ensure disposal at a facility that possessed the proper permits and was properly operated, thereby avoiding the possibility of CERCLA liability; and (3) provide an equitable volume-based user fee for generators of commercial solid waste. Town officials were particularly wary of any option that resulted in a general tax increase because, in effect, this would shift much of the cost of commercial disposal to residents, who were already paying for disposal of their own waste through the purchase of special town garbage bags.

From April through June of 1997, as an interim measure, the Town subsidized the difference between the tipping fee charged at Preston and the overall market price of $57.50 per ton. The subsidy resulted in delivery to Preston of most of the commercial solid waste generated in Stonington. Assuming no change in the Preston tipping fee or the market price, this subsidy program would have cost Stonington's taxpayers about $260,000 for fiscal year 1998.[6]

On April 10, 1997, Stonington's Board of Selectmen voted unanimously to convene a Special Town Meeting on April 21 of the electors and citizens qualified to vote. The purpose of the meeting was to consider and act on a resolution to adopt an ordinance that provided for a municipal takeover of the waste collection function. Public informational meetings concerning the ordinance were held on April 14, 15 and 16. At these meetings, private haulers were provided with information about the ordinance and were given an opportunity to make objections. After a discussion of its pros and cons, the ordinance was adopted by a vote taken at the Special Town Meeting held on April 21, 1997.

Stonington's waste management plan, which is comprised of the ordinance and contracts between the Town and one or more waste-hauling companies, was modeled after: (1) an ordinance and a government contract that were a part of the waste management plan of the Town of Babylon, New York; and (2) a government contract for waste-hauling services entered into by the Town of Smithtown in New York, all of which we have previously held not violative of the Commerce Clause. See SSC Corp. v. Town of Smithtown, 66 F.3d 502 (2d Cir.1995), cert. denied, 516 U.S. 1112, 116 S.Ct. 911, 133 L.Ed.2d 842 (1996); USA Recycling, Inc. v. Town of Babylon, 66 F.3d 1272 (2d Cir.1995), cert. denied, 517 U.S. 1135, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996). The Stonington ordinance created the Authority to implement the waste management plan, and designated the Town's Board of Selectmen as the Authority. The ordinance further provides that, effective July 1, 1997, the Authority or collectors with whom the Authority contracts

---

5. Based on an annual shortfall of 6,000 tons (the entire amount of commercial waste estimated to be collected in Stonington), it would cost nearly $40,000 per month for the Town to meet its obligations. Therefore, the total annual cost would be $480,000.

6. Defendants-appellees estimate that implementation of a subsidy program would result in 12,000 tons of commercial solid waste per annum being delivered to the Preston facility. At a tipping fee of $79 per ton, the per ton subsidy would be $21.50, resulting in a cost of $258,000.

will remove, transport and dispose of solid waste. The ordinance prohibits all others from removing, transporting or disposing of solid waste, and imposes a fine of up to $5,000 for each violation.

Following adoption of the ordinance, the Authority sought bids from private waste haulers by publishing requests for proposals in local newspapers and national trade publications. The Authority indicated that in choosing among contractors it would consider several criteria other than price, including "[e]xperience identical or related to that required under this procurement," and preservation of competition. It intended, to the extent practicable, to provide an opportunity for existing haulers to continue to operate in Stonington.

The Town expected that existing commercial haulers, including Tinnerello, would submit proposals and that at least one of such haulers would continue to provide service in Stonington. However, only three proposals were actually submitted and, of those, one was eventually withdrawn. Plaintiff refused to bid because it believed that the ordinance was unconstitutional. The Authority entered into several contracts with one of the bidders, USA Waste of Connecticut ("USA"). These contracts require USA to deliver Stonington's commercial waste to the Preston facility for processing and have a term of one year. Accordingly, Tinnerello cannot collect solid waste in Stonington at least until July 1, 1998, upon expiration of the contracts with USA.

On the effective date of the ordinance, Tinnerello had approximately seventy commercial customers in the Town of Stonington. Tinnerello holds written contracts with roughly half of those accounts and has oral agreements with the remainder. Three-quarters of the written contracts provide for an initial term of one year with automatic renewals. The remainder of the written contracts provide for an initial term of two or more years. In June of 1997, Tinnerello's total revenue from commercial accounts in

Stonington was about $18,000, representing seven percent of its business when calculated on an annual basis.[7]

On June 20, 1997, Tinnerello commenced this action, seeking both a temporary and a permanent injunction preventing defendants-appellees from enforcing the waste-hauling ordinance. On July 18, 1997, following an evidentiary hearing, the district court denied preliminary injunctive relief by oral ruling during a telephonic conference. The court concluded that Tinnerello had established neither a risk of irreparable harm nor a likelihood of success on the merits with respect to either its Contract Clause or Commerce Clause claim. To facilitate appeal, the district court prepared a written Memorandum Opinion dated August 26, 1997, explaining the basis for its decision in greater detail.

In its written opinion, the court observed that Tinnerello could have foreseen that the Town would undertake to provide municipal waste collection services for two reasons: (1) Tinnerello's contracts were subject to the express authority given to all Connecticut municipalities to "[p]rovide for or regulate the collection and disposal [of waste] by contract or otherwise;" and (2) the *Connecticut Carting* decision striking down East Lyme's flow control ordinance in December of 1995 put Tinnerello on notice that the members of the SCRRRA would need to find an alternative means of satisfying their minimum commitments to the Preston facility. The court also noted that the "ordinance serves significant public purposes by providing for safe and efficient collection and disposal of solid waste on an equitable user-fee basis[; it] accomplishes these purposes in a manner that is reasonable and appropriate." This appeal followed.

## DISCUSSION

### A. Standard for Deciding a Motion for Preliminary Injunction

In order to justify the award of a preliminary injunction, the moving party

---

**7.** Although there is testimony that the loss of Tinnerello's commercial accounts resulted in a loss of one quarter of its gross income, we cannot conclude that the district court's finding as to the loss was clearly erroneous. *See generally War-ner–Lambert Co. v. Northside Dev. Corp.,* 86 F.3d 3, 6 (2d Cir.1996).

must demonstrate that it is likely to suffer irreparable harm in the absence of the requested relief. *See, e.g., NAACP v. Town of East Haven,* 70 F.3d 219, 223 (2d Cir.1995). The movant also must demonstrate either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *See id.* However, in a case in which "the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," the injunction should be granted only if the moving party meets the more rigorous likelihood of success standard. *Plaza Health Lab., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989).

■ In the present case, it seems clear that the Town of Stonington, by enacting an ordinance for the purpose of "providing for safe and efficient collection of solid waste," was acting in the public interest. This was the conclusion of the district court, and we find no basis to disagree with it. Therefore, in order to prevail, Tinnerello must establish irreparable harm and a likelihood of success on the merits.

### B. Standard of Review

■ We review the district court's denial of a preliminary injunction for abuse of discretion. *See Bery v. City of New York,* 97 F.3d 689, 693 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997); *see also Gillespie & Co. v. Weyerhaeuser Co.,* 533 F.2d 51, 53 (2d Cir.1976)(per curiam). An abuse of discretion occurs, *inter alia,* when the district court applies the wrong legal standard or bases its decision on clearly erroneous findings of fact. *See Warner–Lambert Co. v. Northside Dev. Corp.,* 86 F.3d 3, 6 (2d Cir.1996).

We address first the issue of whether Tinnerello has demonstrated a likelihood of success on the merits with respect to either its Contract Clause or Commerce Clause claim.

### 1. The Contract Clause Claim

■ Article I, Section 10 of the Constitution provides in pertinent part: "[N]o State shall ... pass any ... Law impairing the Obligation of Contracts." We have recognized that "[s]tates violate the Contract Clause when legislative action interferes with existing contractual relations." *Kinney v. Connecticut Judicial Dep't,* 974 F.2d 313, 314 (2d Cir.1992)(per curiam). Though the Contract Clause is phrased in absolute terms, the Supreme Court has not interpreted the Clause absolutely to prohibit the impairment of either private or government contracts. *See United States Trust Co. v. New Jersey,* 431 U.S. 1, 21, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977)("Although the Contract Clause appears literally to proscribe any impairment, this Court [has] observed that the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula." (quotation omitted)); *see also Sanitation and Recycling Indus. v. City of New York,* 107 F.3d 985, 992 (2d Cir.1997). Rather, the Supreme Court teaches that there is a need to harmonize the command of the Clause with a state's police power to protect its citizens.[8] *See United States Trust,* 431 U.S. at 21, 97 S.Ct. at 1517. The Court also teaches that the Clause is not violated unless the impairment is a substantial one. *See General Motors Corp. v. Romein,* 503 U.S. 181, 186, 112 S.Ct. 1105, 1109–10, 117 L.Ed.2d 328 (1992).

Following the direction of the Supreme Court, we have held that claims brought under the Contract Clause require consideration of three factors:

(1) whether the contractual impairment is in fact substantial; if so, (2) whether the law serves a significant public purpose, such as remedying a general social or economic problem; and, if such a public purpose is demonstrated, (3) whether the means chosen to accomplish this purpose are reasonable and appropriate.

8. The Court has described the police power as "an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, [which] is paramount to any rights under contracts between individuals." *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241, 98 S.Ct. 2716, 2721, 57 L.Ed.2d 727 (1978).

*Sanitation and Recycling Indus.*, 107 F.3d at 993 (holding that a New York City ordinance enacted to eradicate vestiges of criminal control in the carting industry did not violate the Commerce Clause).

### a. Substantial Impairment

Tinnerello contends that it carried its burden of proving substantial impairment of its contractual relations with various commercial customers operating in Stonington. The district court assumed *arguendo* that Tinnerello could make a sufficient showing of substantial impairment and proceeded with the remainder of the sequential analysis of Tinnerello's likelihood of success. Because certain facts material to a determination of the issue of substantial impairment are unavailable in the record, we decline to pass on the issue as well. However, we are of the opinion that there is a serious question whether Tinnerello can prove that the impairment is a substantial one.

It is undisputed that contractual relationships exist between Tinnerello and various commercial enterprises within Stonington for collection and disposal services. It is also readily apparent that the contractual relationships between Tinnerello and its customers have been impaired by virtue of the challenged ordinance. When Stonington decided to take over waste collection and disposal, it fundamentally altered the relationship between Tinnerello and the Town's generators of commercial waste. Prior to the enactment of the ordinance, many of such generators were customers of Tinnerello. However, after the effective date of the ordinance, the Town (acting through the Authority) became the only possible customer of the commercial waste hauler(s) that submitted successful proposals. Tinnerello could no longer enforce its waste hauling contracts.

The issue of whether the impairment here is substantial must be examined in light of our decision in *Sanitation and Recycling Indus.* There, we held that the primary consideration in determining whether the impairment is substantial is the extent to which reasonable expectations under the contract have been disrupted. 107 F.3d at 993 ("Impairment is greatest where the challenged government legislation was wholly unexpected. When an industry is heavily regulated, regulation of contracts may be foreseeable."). If the plaintiff could anticipate, expect, or foresee the governmental action at the time of contract execution, the plaintiff will ordinarily not be able to prevail. *See Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 60 S.Ct. 792, 84 L.Ed. 1061 (1940).

On the record before us, it is not clear when the various contracts were executed. Accordingly, it would be difficult for us to conclude what Tinnerello should have expected at the time its contracts were executed. To the extent that the contracts were executed subsequent to the enactment of certain state law provisions reserving for all Connecticut municipalities the power to regulate and/or conduct waste collection and disposal, Tinnerello's claim that the ordinance was unexpected is less potent and, accordingly, so too is its claim of substantial impairment. *See* Conn. Gen.Stat. § 7–148(c)(4)(H)(stating that all Connecticut municipalities have the power "to provide for ... the collection and disposal of garbage, trash, rubbish, [and] waste ... by contract or otherwise."); *see also* Conn. Gen.Stat. §§ 7–273bb(a)(9) and (12) (granting municipalities a wide variety of powers concerning solid waste management and disposal, including the power to charge fees for "waste management services" and the power "to do all things necessary for the performance of its duties ... and the conduct of a comprehensive program for solid waste disposal and resource recovery, and for solid waste management services").

Tinnerello contends that the ordinance constitutes a substantial impairment of its contracts because it provided for no grace period. In *Sanitation and Recycling Indus.*, we held that "[a]lso relevant to the determination of the degree of impairment is the extent to which the challenged provision provides for gradual applicability or grace periods." 107 F.3d at 993 (quotation omitted). Accordingly, while Tinnerello is correct that the lack of a grace period is a relevant factor, we do not consider it dispositive in this case in light of the foregoing.

### b. Significant Social or Economic Purpose

Assuming, *arguendo*, that Tinnerello's contractual relations were substantially impaired, we turn now to the issue of whether the challenged ordinance serves a significant social or economic purpose. Tinnerello argues that the district court erred in finding that the ordinance was justified by a significant public purpose. We consider that Stonington's stated goals of safety, efficiency and equity in designing and implementing a waste management system are wholly legitimate. Although the Town's initial enactment of a flow control ordinance in order to provide a safe and efficient disposal operation may have been a constitutionally infirm means, the objective of safe and efficient waste disposal undoubtedly is a legitimate public goal. Imposing the costs of solid waste disposal on an equitable, user-fee basis rather than utilizing general tax revenue is also a legitimate public goal. For example, in *USA Recycling, Inc.,* we noted:

> The Town's imposition of benefit assessments and user fees within the District has the legitimate nonprotectionist goal of apportioning the costs of providing services to that district in an equitable manner.

66 F.3d at 1286.

Tinnerello further contends that "[t]he facts simply do not support a finding that the purpose of the ordinance related to safety, efficiency or equity. Rather, … the sole purpose of the ordinance was to impermissibly direct waste and revenue to a favored facility." We reject this contention. The ordinance challenged in the instant case clearly was enacted in furtherance of the Town's safety, efficiency and equity concerns. It helped the Town ensure that solid waste would be delivered to an incinerator possessing the proper permits rather than to incinerators of dubious quality or to landfills. Not only did this prevent contamination, but it also provided some assurances that the Town would not be at risk for CERCLA liability.

Finally, by ensuring against defaults on the bonds that financed the Preston facility and by making unnecessary a significant governmental subsidy of the tipping fees charged by Preston, the ordinance also served important economic interests. The Supreme Court has held that the economic interest of the state alone may be sufficient to provide the necessary public purpose under the Contract Clause. *See City of El Paso v. Simmons,* 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965). In *Simmons,* the Court held that the "economic interests of the state may justify the exercise of its continuing and dominant protective power notwithstanding interference with contracts." 379 U.S. at 508, 85 S.Ct. at 584 (quotation and citation omitted).

### c. Reasonable Means

■ If the legislative purposes behind the law or regulation are valid, the final inquiry is whether the means chosen to achieve those purposes are reasonable and necessary. *See Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 412–13, 103 S.Ct. 697, 704–06, 74 L.Ed.2d 569 (1983). We must accord substantial deference to the Town's conclusion that its approach reasonably promotes the public purposes for which the ordinance was enacted. As the Supreme Court in *Energy Reserves* instructed, "Unless the State itself is a contracting party … courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.* (quotation and citation omitted); *see also Condell v. Bress,* 983 F.2d 415, 418 (2d Cir.1993).

Tinnerello argues that the ordinance was not rationally related to any of the alleged public purposes for which it was passed. Citing the fact that the Preston facility is priced higher than other available facilities, Tinnerello argues that there is no rational relationship between the ordinance and "efficiency." We disagree. In arguing that the means chosen by the Town to accomplish its legitimate goals are not reasonable and necessary because the rates charged by Preston are higher than the market price, Tinnerello misses the mark. First, the fact that Preston charges a higher tipping fee does not prove that the Town's waste management plan is inefficient. Second, it is not the province of this Court to substitute its judgement for that of either a legislative body or a

body of citizens acting by referendum by determining that there might have been a more appropriate method by which to collect and dispose of waste in Stonington.

■ Similarly, Tinnerello argues that the concern of Town officials about having to raise taxes "could have been addressed by an adjustment to the budget." Alternatively, it contends that the Town should have legally challenged the "minimum commitment" requirement of its contract as illegal flow control. We disagree. The Town need not prove its choice the best among the available alternatives; rather, Tinnerello must prove that there is no rational relationship between the Town's ends and its means. Merely contending that there was a better way, Tinnerello has not carried its burden.

We conclude that a review of the record does not indicate that the Town acted unreasonably. It considered the alternatives and decided to take over collection and disposal of refuse as a municipal function. The Town settled on a plan by which private haulers could continue to operate as contractors of the Town. It solicited bids from haulers and took into account various factors, including past experience in Stonington. Accordingly, we conclude that Tinnerello is not likely to succeed on the merits of its claim that the Town's ordinance violates the Contract Clause.

### 2. The Commerce Clause Claim

■ Finally, we reject the contention that Tinnerello was entitled to a preliminary injunction against implementation of Stonington's waste management plan on the ground that such plan violates the so-called "dormant" Commerce Clause, which limits the ability of states to regulate interstate commerce absent express congressional authorization. *See SSC Corp.,* 66 F.3d at 508–09.

Stonington's waste management plan was modeled after the ordinance and contract implemented in Babylon, New York and the contract entered into in Smithtown, New York, which we have found to be consistent with the Commerce Clause. *See SSC Corp.,* 66 F.3d 502; *see also USA Recycling, Inc.,* 66 F.3d 1272. We find no basis for concluding that the provisions of the waste management plan in this case are distinguishable from the provisions that we have previously upheld.

■ To determine whether a state or municipal activity violates the dormant Commerce Clause, the Supreme Court has instructed that we undertake two separate inquiries. First, we must determine whether the state is "regulating" the market, as opposed to merely "participating" in it. *See Reeves, Inc. v. Stake,* 447 U.S. 429, 436–39, 100 S.Ct. 2271, 2277–79, 65 L.Ed.2d 244 (1980); *see also USA Recycling, Inc.,* 66 F.3d at 1281. If the state activity constitutes only market participation, then the Commerce Clause does not apply and our inquiry ends there. *See id.* If the state activity constitutes market regulation, then the court must proceed to a second inquiry: whether the activity regulates the market evenhandedly with only incidental effects on interstate commerce, or discriminates against commerce by treating in-state interests preferentially. *See id.* "Non-discriminatory regulations that have only incidental effects on interstate commerce are valid unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.' " [9] *Id.* (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)).

■ Like the Town of Babylon in *USA Recycling, Inc.,* Stonington is both a market participant and market regulator. As defendants-appellees concede, when Stonington passed the ordinance, it was engaged in market regulation rather than market participation.[10] However, consistent with the gov-

---

9. Incidental burdens include the following: disruption of interstate travel and shipping due to lack of uniformity in state laws, impacts on commerce beyond the borders of the state, or burdens that fall more heavily on out-of-state interests. *See USA Recycling, Inc.,* 66 F.3d at 1286.

10. A state or local government's actions constitute market participation only if a private party could have engaged in the same activity. *See USA Recycling, Inc.,* 66 F.3d at 1282. By replacing the private market for commercial waste collection through use of an agent or agents, Stonington has exercised its exclusively govern-

ernment contracts at issue in *SSC Corp.* and *USA Recycling, Inc.*, the contract entered into between Stonington and USA providing for waste-hauling services represents market participation. In effect, Stonington has purchased garbage hauling services from USA. In so doing, Stonington "acts as a buyer in the market for incinerating services when it uses tax dollars to repay municipal bonds." *USA Recycling, Inc.*, 66 F.3d at 1291. We have concluded that a buyer of disposal services can dictate by contract where its contractor disposes of such waste without violating the Commerce Clause. *See SSC Corp.*, 66 F.3d at 510 ("To the extent that a state is acting as a market participant, it may pick and choose its business partners, its terms of doing business and its business goals—just as if it were a private party."). Accordingly, we hold that the contract between Stonington and USA constitutes permissible market participation that is non-violative of the Commerce Clause.

However, having concluded that the passage of the challenged ordinance constitutes market regulation, we must decide whether the ordinance discriminates against commerce. Tinnerello contends that the Town's ordinance is no different from the ordinance that we struck down in *SSC Corp.* Specifically, it argues that the Town's ordinance discriminates against interstate commerce because it was designed to benefit a single preferred facility. We disagree. First, Tinnerello overlooks the fact that the ordinance that we struck down in *SSC Corp.* was a flow control ordinance under which a municipality required local garbage haulers to buy processing or disposal services from a local facility. In the present case, the entities generating waste buy collection or disposal services solely from the Town. The Town then uses its discretion to dump the waste in what it deems to be an appropriate location. Moreover, the Town has not favored in-state haulers over out-of-state competitors. It sought bids from local firms as well as those operating around the nation by placing requests for proposals in local newspapers as well as national trade publications. In fact,

the contractor that secured the contract, USA, is a national company rather than a local one.

Since it appears that Stonington's waste management plan imposes no greater burdens on nonlocal firms than it places on local firms, we conclude that it is unlikely that Tinnerello can establish a violation of the Commerce Clause by the Town on the facts before us. We agree with the district court's view that Tinnerello failed to establish a likelihood of success on its Commerce Clause claim.

Because Tinnerello has failed to show a likelihood of success on the merits of either of its two claims, we need not address the issue of whether it has demonstrated irreparable harm.

## CONCLUSION

We have considered Tinnerello's remaining contentions, and we find them all to be without merit. In accordance with the foregoing, we affirm the district court's order denying injunctive relief.

---

mental powers in two ways: (1) it statutorily provided that the only private haulers permitted to collect commercial waste within the munici-

pality were those with whom the Authority contracted; and (2) it established hefty fines for any violations of this provision.