**INCORPORATED VILLAGE OF ROCKVILLE CENTRE; Incorporated Village of Atlantic Beach; Incorporated Village of East Rockaway; Incorporated Village of Floral Park; Incorporated Village of Garden City; Incorporated Village of Lynbrook, Plaintiffs—Counter–Defendants—Appellants,**

v.

**TOWN OF HEMPSTEAD; Town Board of the Town of Hempstead on behalf of the Town Refuse Disposal District, Defendants—Counter–Claimants—Appellees.**

No. 98–9571.

United States Court of Appeals, Second Circuit.

Argued: Aug. 9, 1999.

Decided: Nov. 18, 1999.

Peter J. Mastaglio, Cullen and Dykman, Garden City, N.Y., for Plaintiffs—Counter–Defendants—Appellants.

Sy Gruza, Beveridge & Diamond, P.C., New York, N.Y., for Defendants—Counter–Claimants—Appellees.

Before: CALABRESI, CABRANES, and SOTOMAYOR, Circuit Judges.

CALABRESI, Circuit Judge:

Plaintiffs-appellants, the incorporated Villages of Rockville Centre, Atlantic Beach, East Rockaway, Floral Park, Garden City, and Lynbrook (the "Villages"), appeal from that portion of the final judgment of the United States District Court for the Eastern District of New York (Hurley, *Judge* ), entered November 9, 1998, which grants defendants' motion for summary judgment. We affirm.

## BACKGROUND

From the ubiquitous and relentless flow of our nation's solid waste has emerged another steady stream—dormant Commerce Clause litigation challenging various methods by which municipalities have sought to dispose of their garbage. This case centers on the constitutionality of the agreements entered into by the defendants, Town of Hempstead and Town Board of the Town of Hempstead on behalf of the Town Refuse Disposal District (collectively, the "Town"), with each of the plaintiff Villages.

Under a long-standing arrangement that lasted until early 1984, the Villages sent their waste to the Town's two landfills. The Villages paid for the Town's disposal services through a per-ton "tipping" fee.

The landscape of disposal options changed, however, when the New York Legislature passed the Long Island Landfill Law of 1983, N.Y. Envtl. Conserv. Law § 27–0704 (McKinney 1997), which required municipalities to phase out the use of landfills, "prohibited development of new landfills in deep flow groundwater recharge zones, and designated resource recovery, incineration, or composting as the preferred alternatives for disposal of municipal solid waste." *USA Recycling, Inc. v. Town of Babylon,* 66 F.3d 1272, 1276 n. 1 (2d Cir.1995). The landscape changed more directly when, in 1985, New York enacted Chapter 797 of the Solid Waste Management Act, which authorized the Town to exercise exclusive control over all solid waste within its jurisdiction. *See* 1985 N.Y. Laws 797.[1]

In the wake of this legislative change, the Town closed the landfills. It continued, however, to dispose of the Villages' waste, by sending it to sites off Long Island. Seeking a longer-term solution, the Town in 1985 negotiated an agreement with American Ref–Fuel Company of Hempstead ("Ref–Fuel"), under which Ref–Fuel would reconstruct and operate a resource recovery facility that could handle the waste from all the Villages.[2] The Town of Hempstead Industrial Development Agency underwrote the project by issuing bonds.

In early 1986, the Town entered into a twenty-year inter-municipal agreement

---

1. After the Long Island Landfill Law was enacted, it was apparently not unusual for the New York legislature to pass statutes authorizing specific towns to assume various waste regulation responsibilities. *See, e.g., USA Recycling,* 66 F.3d at 1277 (describing 1985 N.Y. Laws 478, § 4(1), which authorized the Town of Babylon to enter into contracts to construct an incinerator).

2. In more common parlance, a "resource recovery facility" is an incinerator. New York has "articulated [a] policy preference for ... 'trash-to-ash' facilities [because they] reduce the volume of solid waste, put garbage to productive use by generating electricity, and were deemed to be less harmful to the environment." *USA Recycling,* 66 F.3d at 1276–77.

("IMA") with each of the plaintiff Villages.[3] The IMA requires that each Village deliver all waste generated within its jurisdiction and collected by it or on its behalf to the Town, which, in return, is obliged to accept and dispose of all such waste.[4] The IMA also requires that the Villages pay various fees to help finance the cost of the Town's disposal services.

The IMA makes clear that the Town, in order to make the Ref–Fuel project economically feasible, sought a commitment from the Villages that they would use the Town exclusively to dispose of all of their garbage.[5] Presumably, without sufficient trash from which to recover energy, the facility would not survive financially. Similarly, the IMA indicates that the Villages sought a commitment from the Town that it would serve, on a long-term basis, as supplier of all their disposal services.[6]

In September 1986, after all of the Villages had entered into IMAs, the Town, in the exercise of its authority to regulate local solid waste pursuant to Chapter 797, enacted a "flow control ordinance," Local Law No. 72–1986, which required, *inter alia*, "[a]ll municipalities wholly within the town [to] enter into or be subject to the provisions of [an intermunicipal agree-

ment] or other appropriate arrangement approved by the town." *Id.* § 52.[7]

In November 1996, the Villages filed this 42 U.S.C. § 1983 suit, seeking a judicial declaration that the flow control ordinance and the IMA were unconstitutional under the dormant Commerce Clause. The suit also included supplementary state law contract claims. The primary purpose of the suit, to allow the Villages to escape liability for disposal fees assessed by the Town pursuant to the IMA, is apparent from the complaint.

The Town conceded, and the district court agreed, that the ordinance was unconstitutional under *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), which held that a similar flow control ordinance impermissibly discriminated against interstate commerce, *see id.* at 390, 114 S.Ct. 1677. The court below upheld the IMA, however, holding that the Town entered into it as a market participant in the waste disposal market and that its contractual arrangements with the Villages were not barred by *Carbone.*

The Villages unsuccessfully moved for reconsideration and the district court on November 9, 1998 entered a final judg-

---

3. Although there are six IMAs at issue, one between the Town and each of the plaintiff Villages, the text of each IMA is the same. For simplicity, we will use IMA in the singular.

4. The IMA actually refers to "all Acceptable Waste," which appears to exclude certain hazardous waste.

5. The IMA provides that "it is mutually understood that for the benefit of the parties hereto and all other Participants in the Town, *in order to finance* the reconstruction of the necessary facility and related equipment and *to prevent wasteful duplication and uneconomical operations and to minimize adverse environmental impacts, it is necessary that Participants [the Villages] enter into legally enforceable commitments that, upon the execution of the Service Agreement [with Ref–Fuel], each of them will deliver all Acceptable Waste presently collected in the Town, by or on behalf of Participants, to the Town and to

pay specific minimum annual fees to the Town for the availability of the Town System (regardless of delivery), all expressly conditioned as aforesaid upon the Town Board's determination, if any, to approve the execution of a Service Agreement with American REF–FUEL." Jt.App. at 101 (emphasis added).

6. The IMA states that "the undersigned Participant *seeks assurance* that the Town will, during the term of this Agreement, accept all of Participant's Solid Waste." Jt.App. at 101 (emphasis added).

7. The flow control ordinance was significantly more comprehensive than the IMA. Whereas the IMA concerned the Villages' disposal of waste between 1986 and 2006, the ordinance: (1) governed waste disposal, collection, *and* transportation, (2) applied not only to incorporated villages, but also to unincorporated areas and private carters, and (3) had no time limitation.

ment (1) granting the Villages' cross-motion for summary judgment declaring the ordinance unconstitutional, (2) granting the Town's motion for summary judgment dismissing the challenge to the IMA, and (3) dismissing the Villages' supplemental state law claims and cause of action for fees under 42 U.S.C. § 1988. The Villages appeal the grant of summary judgment with respect to the constitutionality of the IMA.

## DISCUSSION

Although the Commerce Clause, taken literally, constitutes only a grant of power to Congress, permitting it to act affirmatively to regulate interstate commerce, *see* U.S. Const. art. I, § 8, cl. 3 ("Congress shall have Power ... [t]o regulate Commerce ... among the several States"), the Supreme Court has long read the Clause also to prohibit the states, in the absence of specific congressional authorization, from regulating interstate commerce. *See, e.g., Lewis v. BT Inv. Managers, Inc.,* 447 U.S. 27, 35, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980); *Hughes v. Oklahoma,* 441 U.S. 322, 326, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). This prohibition on state action is said to arise implicitly from the "dormant" aspects of the Commerce Clause. *See, e.g., Fulton Corp. v. Faulkner,* 516 U.S. 325, 330–31, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996).

Following this line of decisions, the Court in *Carbone* held invalid a flow control ordinance that "require[d] all solid waste to be processed at a designated transfer station before leaving the municipality." *Carbone,* 511 U.S. at 386, 114 S.Ct. 1677. The ordinance was, the Court held, "just one more instance of local processing requirements that we long have held invalid." *Id.* at 391, 114 S.Ct. 1677. Nowhere in *Carbone,* however, did the Court discuss the well-established "market participant" doctrine, under which a state could escape the restrictions of the dormant Commerce Clause so long as it accomplished the results it desired, not by regulation, but by participating in the mar-

ket. *See South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 93, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984); *White v. Massachusetts Council of Constr. Employers, Inc.,* 460 U.S. 204, 206–08, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983); *Reeves, Inc. v. Stake,* 447 U.S. 429, 436–37, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 810, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). According to commentators, this omission in *Carbone* "left the vitality and scope of the market participant [doctrine] in doubt." Richard J. Roddewig & Glenn C. Sechen, *The Second Circuit Defines the Limits of Carbone,* 28 Urb. Law. 847, 848 (1996).

Since *Carbone,* our court has entertained several dormant Commerce Clause challenges to arrangements, both contractual and legislative, through which local governments have sought to dispose of their trash. *See Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59 (2d Cir.1998) (upholding contractual and legislative arrangements); *Sal Tinnerello & Sons, Inc. v. Town of Stonington,* 141 F.3d 46 (2d Cir.1998) (same); *USA Recycling, Inc. v. Town of Babylon,* 66 F.3d 1272 (2d Cir.1995) (same); *SSC Corp. v. Town of Smithtown,* 66 F.3d 502 (2d Cir.1995) (upholding contractual but striking down legislative arrangement). *Carbone* notwithstanding, challenges to the contractual arrangements failed in all of these cases because the court found that the market participant exception applied. *See Automated Salvage,* 155 F.3d at 79; *Tinnerello,* 141 F.3d at 55–56; *USA Recycling,* 66 F.3d at 1291; *SSC,* 66 F.3d at 518; *cf. Gary D. Peake Excavating Inc. v. Town Bd. of Hancock,* 93 F.3d 68, 76 (2d Cir.1996) (upholding a town ordinance prohibiting disposal of waste within the town except at a municipally operated transfer station or landfill).

On appeal, plaintiffs reiterate the argument they made to the district court: namely, that since the Town participates only in the waste *disposal* market, it can-

not regulate the separate waste *collection* market. They contend that the IMA improperly governs the waste collection market by forcing the participants in that market to haul all waste to a designated facility, i.e., to use the Town's disposal services.

Plaintiffs' argument relies on *South–Central Timber,* in which the Supreme Court held invalid Alaska's requirement that timber purchased from state lands be processed within the state. *See* 467 U.S. at 97, 104 S.Ct. 2237. A plurality of the Court rejected Alaska's argument that it was acting in the processed timber market, and found instead that the state was impermissibly "using its leverage [as a participant in the timber market] to exert a regulatory effect in the processing market, in which it [was] not a participant." *Id.* at 98, 104 S.Ct. 2237. The plurality concluded that while a state may, under the market participant exception, prefer "its own residents in the initial disposition of goods when it is a market participant," it may not ordinarily attach "restrictions on dispositions subsequent to the goods coming to rest in private hands." *Id.* Such "downstream restrictions" are suspect for two reasons. *Id.* at 99, 104 S.Ct. 2237. "First, simply as a matter of intuition a state market participant has a greater interest as a 'private trader' in the immediate transaction than it has in what its purchaser does with the goods after the State" has sold them, *id.* at 98, 104 S.Ct. 2237, for "[i]n the commercial context, the seller usually has no say over, and no interest in, how the product is to be used after sale," *id.* at 96, 104 S.Ct. 2237. And second, "downstream restrictions have a greater regulatory effect than do limitations on the immediate transaction." *Id.* at 99, 104 S.Ct. 2237.

Plaintiffs' reliance on *South–Central Timber* is misplaced. This is so because the controls at play in *South–Central Timber* "restrict[ed the purchaser's] post-purchase activity," in which an ordinary market participant generally has no interest.

*Id.* The limitations imposed by the IMA are, by contrast, not uncommon in private transactions where, as here, the restrictions are essential to the feasibility of the contract itself, *see infra,* and, to borrow the language of the Supreme Court, affect "an ongoing commercial relationship in which the [Town] retain[s] a continuing proprietary interest." *Id.* Thus, in applying the principle that a state may not regulate a market in which it does not participate, the plurality in *South–Central Timber* did no more than limit the availability of the market participant exception to those situations in which the state behaves more like an ordinary private trader—who would lose interest in overseeing the fate of goods once sold—than like a public entity seeking to effect an essentially regulatory and non-commercial purpose by attaching conditions to an otherwise commercial transaction. In other words, the plurality simply restated the not extraordinary notion that the market participant exception does not apply when the State is acting more as a regulator than as a market participant.

■ As we have had repeated occasion to observe, "[a] state's actions constitute 'market participation' only if a private party could have engaged in the same actions." *SSC,* 66 F.3d at 512; *see also Tinnerello,* 141 F.3d at 55 n. 10; *USA Recycling,* 66 F.3d at 1282. And as we have also frequently said, when the state avails itself of the unique powers or special leverage it enjoys by virtue of its status as sovereign, it is "engaging in market regulation." *SSC,* 66 F.3d at 512. It is for this reason that ordinances that "threaten[ ] garbage haulers with criminal fines and jail terms if they fail to do business with [a designated] incinerator" fall outside the scope of the market participant exception. *Id.* ("No private company in the open market could force others to buy its services under pain of criminal penalties."). Accordingly, in cases like the one before us, where a private party could have engaged in the transaction, courts must scrutinize

the transaction to determine whether the state is acting more like an ordinary participant in the commercial market or more like a regulator trying to achieve an otherwise unconstitutional purpose by attaching conditions to its commercial transactions. *Compare South–Central Timber*, 467 U.S. at 82, 104 S.Ct. 2237 (invalidating contractual conditions that imposed downstream requirements on goods sold), *with White*, 460 U.S. at 205–06, 211 n. 7, 103 S.Ct. 1042 (upholding an executive order issued by the Mayor of Boston that permitted the city to contract with construction firms only if at least half of their workers were bona fide Boston residents, even though this affected a separate employment market, and rejecting the contention that such activities are "beyond market participation [simply] because [they] regulate[ ] employment contracts between public contractors and their employees").

■ In the instant case, a private party seeking to enter the waste disposal market, but having to fund the creation of a local incinerator like the one here, could and very likely would have engaged in exactly the same kinds of actions as those taken by the Town of Hempstead when it negotiated and subsequently sought to enforce the IMA. And significantly, the key IMA provisions—that is, the Town's agreement to sell its disposal services to the Villages for the next twenty years only on the condition that the Villages agree to use the Town exclusively in fulfilling their disposal needs—mirror language that is typical in what are called private requirements

contracts. Such provisions, moreover, generally reflect and respond to the economic needs of both parties. *See Standard Oil Co. v. United States*, 337 U.S. 293, 306–07, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949) (noting, in an antitrust case, the beneficial economic effects that requirements contracts extend to both buyer and seller: they "assure [the buyer] supply, afford protection against rises in price, [and] enable long-term planning on the basis of known costs;" similarly, they give the seller "protection against price fluctuations, and—of particular advantage to a newcomer to the field to whom it is important to know what capital expenditures are justified—offer the possibility of a predictable market").[8]

Plaintiffs rely also on language from our decision in *SSC*, but this reliance is similarly misplaced. In *SSC*, we held invalid a flow control ordinance but upheld a contractual arrangement that required all private waste haulers who collected local waste to use a designated incinerator that was financed by municipal bonds. *See SSC*, 66 F.3d at 506. The defendant Town of Smithtown bought waste collection services from private haulers and contractually required the haulers, in turn, to buy waste disposal services from the Town at the local incinerator. We found this contract to be protected by the market participant exception because the Town was, in effect, buying disposal services from itself, with the private haulers standing in as contractual middlemen. *See id.* at 514–17. Smithtown's status as a buyer of waste collection services was, *on the facts of SSC*,

8. Of course, we do not today decide that all such requirements contracts constitute acts of market participation. We merely hold that where, as here, the consumers (i.e., the Villages) benefit from the availability of the services of a local incinerator, and the provider of those services requires assurances of continued sales to make the project economically feasible in the first place, contracts like the IMA are ordinary· market transactions that qualify for the market participant exception.

Nor do we mean to suggest—as the district court implied—that a state or local government is always free to accomplish by contract

what it is constitutionally forbidden from doing by ordinance. *See South–Central Timber*, 467 U.S. at 97, 104 S.Ct. 2237 ("[T]he [market participant] doctrine is not *carte blanche* to impose any conditions that the State has the economic power to dictate, and does not validate any requirement merely because the State imposes it upon someone with whom it is in contractual privity."). Our decision here, as in *SSC*, sustaining the validity of a municipal contract governing the flow of waste despite the invalidity of a related flow control ordinance, is completely consistent with this teaching of *South–Central Timber*.

therefore central to the constitutionality of the contractual restriction. Plaintiffs seize on this, however, to argue much more broadly that the local-disposal requirement in the case before us is unconstitutional because Hempstead, unlike Smithtown, was not a buyer of waste collection services. They point to our statement in *SSC* that

> Smithtown could not force SSC or anyone else to do business with the town as a *seller* of disposal services at the Huntington incinerator, without resorting to its police powers—and thereby acting as a market regulator. But because Smithtown is substantially the *buyer* (and consumer) of those services, it can dictate by contract where SSC must purchase the waste disposal services provided to the town.

*Id.* at 517.

Distilled, plaintiffs' argument is essentially that because the Town of Hempstead did not buy waste collection services, it must have "forced" the Villages into the IMA. The Villages misread *SSC.* The passage from *SSC* cited above merely restates the proposition that a governmental entity that secures contractual "assent" by leveraging its police powers cannot avail itself of the market participant defense. This is so because "[a] state's actions constitute 'market participation' only if a private party could have engaged in the same actions," *id.* at 512, and private parties possess no police powers. *SSC* should not be read to mean that any time a party, other than a buyer, places exclusivity requirements in a contract, it is automatically acting as a market regulator. Such a rule would fly in the face of the observation that private parties routinely negotiate for, and agree to, such provisions when they enter into requirements contracts.

Plaintiffs assert, however, that the facts before us indicate that the Town obtained the Villages's assent to the exclusivity requirement in a way that renders the market participant exception inapplicable. We are unpersuaded. According to plaintiffs, the Town induced the Villages to agree to the IMA only by threatening to enact a flow control ordinance—that is, only by resorting to police powers. But, contrary to plaintiffs' contention and to the district court's view,[9] such a "threat"—which the Town denies having made—does not, without more, transform the Town into a market regulator. At least in the circumstances of this case—in which the Town asserts that the Villages "eagerly welcomed" the twenty-year commitment of the IMA because it represented a long-term "solution [to their] own solid waste disposal problem," and the Villages do not deny that the IMA represented just such a solution or that they could have refrained from signing it—the evidence is insufficient to warrant a trial on whether the Town acted as a market participant.

Admittedly, the IMA does indirectly restrict the freedom of waste haulers—normally participants in the waste *collection* market—to dispose of refuse from the Village at the facility of their choice (presumably, the one with the lowest fee). These collectors are, moreover, not in contractual privity with the Town. Without more, however, these secondary effects of the IMA on the private haulers do not create a constitutional violation. As discussed above, the constitutional question turns simply on whether the Town was engaged in an activity equally available to a private party. Because a garden-variety requirements contract often affects entities not directly party to the contract, the impact

---

**9.** The district court found that a fact question existed as to whether the Villages were influenced in their decision to sign the IMA by "the Town's alleged implicit invocation of" its ordinance-making power. Nevertheless, the district court granted summary judgment based on the market participant exception. Although we believe that the district court's view of the exception was overly broad, *see supra* note 8, we affirm for the reasons stated in the text.

on the private haulers does not by itself invalidate the IMA.[10]

We conclude that the court below correctly found that the IMA does not violate the dormant Commerce Clause.[11] The judgment of the district court dismissing plaintiffs' complaint is AFFIRMED.

10. At oral argument, plaintiffs raised an argument that was not presented to the district court, specifically, that the IMA is unconstitutional because it requires the Villages to act as regulators in the waste collection market by, if necessary, passing ordinances that require private collectors to use the Town's incinerator. Plaintiffs contend that ordinances like these can violate the dormant Commerce Clause by restricting the market freedom of private citizens. In support of this claim, plaintiffs point to Section 403 of the IMA, which states in relevant part:

Participant shall take all such acts, including, but not limited to, enactment of appropriate local legislation/ordinances regulating the collection and disposal of Solid Waste and enforcement of same so as to

promote and require the delivery of all Acceptable Waste ... to the Town System. There is, however, nothing in the record to suggest that the Villages have passed any such ordinances. Because of this fact, and because the Villages did not make this point before the district court, we express no view on whether either Section 403 of the IMA, or any ordinances passed in accordance with it, would render the arrangement between the Town and the Villages unconstitutional.

11. Plaintiffs also argue that if they prevail on their challenge to the IMA, they should be awarded attorneys' fees under 42 U.S.C. § 1988 (authorizing courts to award attorneys' fees to the prevailing party in a § 1983 suit). Since plaintiffs have not prevailed on their IMA claim, they are not entitled to fees.